963 So.2d 1028 (2007)
STATE of Louisiana
v.
Darrell M. DURAND.
No. 07-KA-4.
Court of Appeal of Louisiana, Fifth Circuit.
June 26, 2007.
*1030 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, Donald A. Rowan, Jr., Assistant District Attorneys, Twenty-Fourth Judicial District, Parish of Jefferson, State of Louisiana, Gretna, Louisiana, for Plaintiff/Appellee.
Holli A. Herrle-Castillo, Louisiana Appellate Project, Marrero, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and CLARENCE E. McMANUS.
MARION F. EDWARDS, Judge.
In this criminal matter, defendant/appellant, Darrell M. Durand ("Durand") appeals his conviction for second degree murder. For the reasons that follow, Durand's *1031 conviction is affirmed, and we remand for the correction of errors patent on the face of the record.
On October 13, 2005, a grand jury in Jefferson Parish returned an indictment against Durand, charging him with second degree murder in violation of LSA-R.S. 14:30.1. Durand pled not guilty at his arraignment on January 25, 2006.
On September 13, 2006, the trial court denied Durand's motion to suppress statements. Also on this date, Durand proceeded to trial before a twelve-person jury, which found him guilty as charged. Two days later, Durand filed a motion for post-verdict judgment of acquittal, which was denied. On September 15, 2006, Durand was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Durand orally gave his notice of intent to appeal and then filed a written motion for appeal on September 18, 2006. Durand's motion for appeal was granted on September 25, 2006.
Durand was arrested on August 17, 2005 for the murder of Ivory Hill. Durand was questioned about his involvement in the case and gave two statements to Detective Eddie Klein ("Detective Klein") of the Jefferson Parish Sheriff's Office Homicide Section. These statements were played for the jury.
In Durand's first taped statement, he stated the following: On August 15, 2005, an incident took place on Terrace Street involving Joseph Buchert, Jr., Peter Aicklin ("Peter"), Todd Strickland ("Todd"), and himself. A black male pulled in the driveway on a motorcycle. Durand and the man had words. The man swung his helmet at Durand but did not hit him since he moved out of the way. Durand grabbed him in a headlock, and they went to the ground. Durand grabbed the man in a choke hold to try to stop the man from hurting him since his hands were broken. Durand said that he could not see anything else and did not know what others around him were doing at the time. Believing the man passed out, Durand stood back up and went to Peter's house with blood on his hat. Durand then went home. Also, during this statement the following exchange took place between Detective Klein and defendant:
DET. E. KLEIN: Okay so earlier but clarify one more thing, earlier you had told me that y'all were gonna take the victims [sic] dope from him is that correct?
D. DURAND: He was coming over there to bring drugs yes sir.
DET. E. KLEIN: And y'all were just gonna take it and walk away from him?
D. DURAND: Well he I, I had no intention of, of fighting the man at all no sir.
DET. E. KLEIN: Right but what I meant was y'all just were gonna um, take the drugs from him and not pay him and walk away?
D. DURAND: Well I didn't have any money, I don't know if, I don't know exactly what would have happened but that, that was pretty much, that's I couldn't paid him for it.
DET. E. KLEIN: So you was gonna just try to take `em?
D. DURAND: If he had anything one [sic] him I guess that was the you know, I'm trying to do this the best I can, I'm just telling you I'm really ah . . .
DET. E. KLEIN: . . . okay . . .
D. DURAND: . . . in a bad frame of mind I can't believe this guy's dead.
DET. E. KLEIN: Okay.

*1032 D. DURAND: And I had anything to do with it. Oh man (sigh)
In Durand's second statement, he remembered what happened to the clothes he and Todd had taken off at Peter's house. He stated that they put them in a plastic bag and either defendant or Todd put the bag in a drain on the street. He said his orange hat was in the bag.
Durand also testified at trial, stating the following: He was on Terrace Street on his way to a friend's house when he saw Todd, a man Durand knew only as "Jodie", Peter, and another older gentleman sitting and talking outside. He stayed to drink beer and talk. The victim, who Peter and Jodie knew sold crack cocaine, came down the street on a motorcycle. Peter and Jodie met the victim on the curb and talked to him. The victim asked Durand if he had a problem with him and asked why he was looking at him. The victim and Durand exchanged words and the victim cursed at Durand. The victim left, but Jodie and Peter said he was coming back. Although Durand wanted to leave before he got back, the victim came back about twenty or thirty minutes later, pulled into the driveway, and got off of his motorcycle. The victim said, "I got you now bitch" and swung his helmet at Durand. Durand ducked, grabbed the victim around his neck, and they went to the ground.
Durand admitted that he did choke the victim but stated he was in fear. Durand hurt his wrists in June of 2005 when he was installing siding on a friend's house. He had surgery and had to wear braces or "soft casts." Because of his shattered wrists, Durand said that he did not want to take a chance of hurting himself and all he knew to do was to choke him. Durand said that he let the victim go when he stopped moving.
Durand said he did not hit the victim but only put him in a choke hold and held him for about a minute. Although Durand said he did not see who was hitting the victim or what they were hitting him with, he admitted that he could feel someone beating him as he held him in a choke hold. Durand agreed this is how he got blood on his body and on his clothes. When Durand left, he did not know the victim was dead.
Durand left, and when he went down the street he saw Peter on his porch. Peter told Durand he had blood on him, and Durand asked Peter if he could go inside to wash it off. Peter gave Durand a shirt to go home in. While he was at Peter's house, Jodie and Todd came. Durand and Todd put clothes in a bag and the bag was put in a drain so he would not get caught with it on the way home. He did not remember who put it there. Durand said he and Todd split up and then he went home.
Durand stated he did not smoke crack and denied robbing the victim of any crack. He denied taking anything from the victim. Durand said he told the detective it was not "his deal to rip him [the victim] off."
An autopsy of the victim was performed on August 16, 2005. According to Dr. Karen Ross ("Dr. Ross"), an expert in the field of forensic pathology, the victim's cause of death was traumatic asphyxia due to neck compression, associated with blunt force injuries. She explained that she believed the neck compression could singularly have caused his death, but the blunt force injuries to the head may have contributed by making him more susceptible to being placed in a choke hold or by making him die faster from asphyxia. She testified that the neck compression was consistent with someone putting the victim in a choke hold.
*1033 Dr. Ross identified State's Exhibits 42-54 as photographs taken during the victim's autopsy. With these exhibits, Dr. Ross explained the bruises and lacerations found on the victim's face and head. She explained that the skin lacerations were caused by the striking of an object. From the photographs, she pointed out petechia, little hemorrhages usually associated with cells not getting enough oxygen. She stated there was more petechia on his neck than there was in his eye, indicating the force applied there. She also acknowledged there was hemorrhaging in his neck muscles, his neck organs, and the base of his tongue. She also noted there were teeth impressions on the victim's tongue. She demonstrated there was hemorrhage underneath the scalp and concluded there were at least five impacts to the head. Dr. Ross testified that the arm braces would not prohibit putting a choke hold on someone. Instead, they could stabilize the wrist and may have allowed more force to be applied. She testified that the extensive hemorrhage indicated that a significant amount of force was applied to the victim's neck.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, Durand argues the trial court erred in denying his motion for post-verdict judgment of acquittal. He contends that his conviction is based on insufficient evidence and that the evidence presented did not support either theory of second degree murder. He argues the only evidence presented by the State to implicate him in the victim's death was his statement which provided that the victim, unprovoked, attacked him with a motorcycle helmet while he had casts on both arms due to recent surgery on his shattered wrists. Durand contends he defended himself by placing the victim in a choke hold and that the State failed to prove he did not act in self-defense.
The State responds that the trial court properly denied the defendant's motion for post-verdict judgment of acquittal because any rational trier of fact could have found that defendant committed second degree murder and that he was not acting in self-defense at the time of the killing. The State contends the jury reasonably concluded that the evidence demonstrated that the killing resulted from defendant's specific intent to kill or to inflict great bodily harm and/or while the defendant was engaged in the perpetration or attempted perpetration of a robbery.
A post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty.[1] If the trial court or the appellate court "finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post-verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense."[2] An appellate review of the denial of the motion for post-verdict judgment of acquittal is controlled by the standards set forth in Jackson v. Virginia.[3] The Jackson standard for testing the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential *1034 elements of the crime beyond a reasonable doubt.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience.[4] When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."[5] On appeal, the reviewing court does not determine if another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. Instead, the appellate court must evaluate the evidence in a light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.[6] Ultimately, both direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.[7]
The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal.[8]
Second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including simple robbery, even though he has no intent to kill or to inflict great bodily harm.[9]
In order to prove second degree murder under the first theory, the State must prove the killing and that the defendant had specific intent to kill or inflict great bodily harm.[10] Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."[11] The determination of specific criminal intent is a question of fact.[12] Specific intent may be inferred from the circumstances and from the defendant's actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries.[13]
On appeal, Durand claims the State failed to prove that he did not act in self-defense, citing LSA-R.S. 14:20.[14] Although *1035 Durand stated at trial he was trying to defend himself, the jury instructions did not contain instructions on self-defense or justifiable homicide. Durand's focus on appeal, however, is that his actions in defending himself were a mitigating factor in determining specific intent.
On September 15, 2006, defense counsel argued the State failed to prove beyond a reasonable doubt the elements of second degree murder; however, the trial court denied defendant's motion for post-verdict judgment of acquittal. In doing so, the trial court recognized that the case was close on the evidence presented and acknowledged that in defendant's statements he found the detective asking him questions and trying to put words into his mouth; however, he stated that defendant had denied just about every one of the detective's prompts. The trial court denied the motion, viewing the case in the light most favorable to the State.
After viewing the evidence in the light most favorable to the State, we find that any rational trier of fact could have found that the State proved the essential elements of second degree murder beyond a reasonable doubt.
Durand admits that he placed the victim in a choke hold and held the victim for about a minute while someone hit the victim. Durand admitted the choke hold was "pretty hard" and agreed he was really bearing down on the victim. According to Dr. Ross' testimony, the victim died from traumatic asphyxia due to neck compression, associated with blunt force injuries. Dr. Ross testified that she believed the neck compression could have singularly caused the death. She testified that the victim's injuries were consistent with the victim being placed in a choke hold. She also explained significant force was used to cause such injuries to the victim.
We find the evidence presented was constitutionally sufficient to support the jury's finding that defendant had the specific intent to kill or inflict great bodily harm to the victim. This specific intent could be inferred from the extent and severity of the victim's injuries. Dr. Ross testified that it was possible for someone to be put in a choke hold and have no hemorrhaging at all. Therefore, the jury could have reasonably rejected defendant's version of the events that his actions were in self-defense.
Durand testified that he was trying to defend himself and was in fear for his safety and panicked. Durand believed the victim was bigger than him. Durand testified that he let the victim go when the victim stopped trying to get away from him and stopped moving. Durand believed the victim was passed out. When asked why he did not call the police to say he was attacked, he claimed it was because of his record. Durand claimed he had never seen the victim before, he was not familiar with the neighborhood, and had no idea if the victim had a weapon.
Although both of Durand's wrists were broken, the victim was outnumbered. The victim's head was being hit with an object by another while Durand held the victim in a choke hold. The record does not reflect that Durand suffered any injuries from the victim and only reveals that the victim swung his helmet at him but missed. The testimony of Dr. Ross reveals the significant force used to produce such injuries and defendant himself admitted that the *1036 choke hold was "pretty hard." Therefore, the jury could have not believed defendant's claim of self-defense and found beyond a reasonable doubt the defendant did have the requisite intent to commit second degree murder.
As such, we find that the trial court did not err in denying defendant's motion for post-verdict judgment of acquittal.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, Durand argues the State was allowed to admit five objectionably gruesome photographs, State's Exhibits 50-54. Durand argues the photographs were more prejudicial than probative. Finally, Durand notes that the trial judge told the jurors they did not have to look at the photographs, recognizing they were graphic. Durand argues if the jurors had the choice of not looking at the evidence, then the evidence could not possibly be so relevant and probative that admission was required.
The State responds that while the autopsy photographs it introduced were graphic, the record demonstrates that their probative value outweighed any prejudicial effect. The State argues that the contested photographs were necessary for the State to establish the cause of death and to demonstrate the multiple, substantial injuries inflicted upon the victim in order to meet not only the burden of proof for second degree murder but to help refute defendant's contention that he acted in self-defense. Further, the State argues the photographs were specifically selected by Dr. Ross to use to assist her in explaining her testimony to the jury. The State argues that because the photographs were not so gruesome as to overwhelm the jurors' reason and lead them to convict defendant without sufficient evidence, relief is not warranted.
Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[15] All relevant evidence is admissible, except as otherwise provided by law, and irrelevant evidence is not admissible.[16] However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.[17]
Generally, photographs are admissible if they illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, subject to the test that their probative value outweighs any prejudicial effect.[18] The State is entitled to the moral force of its evidence and post mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement, and number of wounds, as well as to provide positive identification of the victim.[19]
In general, an appellate court places great weight upon a trial court's ruling on the relevancy of evidence and *1037 such a determination will not be reversed absent a clear abuse of discretion.[20] Photographic evidence is properly admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient evidence, i.e., when the prejudicial effect of the photographs substantially outweighs their probative value.[21]
After a review of the record, we find that the trial court did not err in admitting the photographs into evidence.
Prior to the introduction of the photographs, defense counsel objected to certain autopsy photographs that would be used by Dr. Ross. Defense counsel argued the photographs were "vile, and grotesque and disgusting" and that Dr. Ross did not need the photographs to accompany her testimony. The trial judge stated he thought they were "probably more probative than prejudicial."
Before State's Exhibits 50-54 were discussed, the trial court made the following comments to the jury: "You're about to see some photographs that the Doctor needs to explain what she actually did. Some of the photographs are very gross, but they're necessary for the explanation, so if you see something you don't like, close your eyes. It's just a warning."
Dr. Ross explained that State's Exhibit 50 was taken after the body was opened, and admitted it was graphic. She pointed out the petechia on the victim's neck, which were larger than the ones seen in the victim's eye, indicating some force was applied to the neck. She pointed out that some of the blood vessels were broken.
Dr. Ross explained State's Exhibit 51, another photograph taken after the body was opened which she admitted was graphic. She explained to examine the victim's head, she had to open the scalp and pull it forward to see any hemorrhage underneath the scalp. Underneath the areas of abrasions and contusions on the victim's head, there were five discrete areas of hemorrhage, which indicated at least five impacts to the victim's head.
Dr. Ross used State's Exhibit 52, a photograph of the front of the victim's neck, to demonstrate the hemorrhages to the neck muscles and the thyroid cartilage of the voice box. This photograph was used to show hemorrhage, indicating significant force applied there.
Dr. Ross explained that State's Exhibit 53 was taken after she took the neck organs, tongue to trachea, out of the victim's body. She showed the victim's tongue and the floor of his mouth. She explained the photograph tried to document the hemorrhaging and the evidence of injuries. She testified that looking inside his mouth showed teeth impressions on his tongue and hemorrhaging, lacerations, and bruising. The teeth impressions on the tongue were also present in State's Exhibit 54. The epiglottis was shown as well.
Defendant argues that the fact that the victim died as a result of being choked to death by defendant is not at issue, and the only issue was whether defendant was defending himself or if he intended to kill the victim. One of the elements comprising the State's burden of proof was whether defendant had the intent to kill, which can be illustrated by circumstantial evidence. In the present case, the severity of the injuries and the amount of force applied to *1038 cause the injuries to the victim were clearly probative and relevant to the issue of whether defendant possessed the requisite intent to kill. These autopsy photographs illustrated Dr. Ross' testimony while she described the location and severity of the victim's injuries.
Given defendant's claim he did not intend to kill the victim and instead had acted in self-defense, the photographs are relevant to demonstrate the cause of death, placement of wounds, and to establish his specific intent to kill. Dr. Ross specifically pulled the photographs necessary to assist her in her testimony which presented her findings to the jury. It does not appear that it would have been difficult for the jury to distinguish the injuries inflicted by defendant from what was done to the victim's body during the autopsy. During trial, it was clear that defendant had placed the victim in a choke hold. Moreover, the trial court initially stated the photographs were necessary to explain what Dr. Ross did.
In light of the foregoing, we find that, although the photographs were gruesome, the probative value of the photographs outweighed any prejudicial effect against defendant and, therefore, the trial court did not err in admitting the photographs into evidence.

ASSIGNMENT OF ERROR NUMBER THREE
In his third assignment, Durand argues that the record indicates that a motion for new trial was granted, but a new trial was never scheduled. Defendant argues his motion for new trial was granted and, therefore, the case should be remanded either for a new trial or for the trial judge to clarify his intentions in signing both the order for the appeal and for a new trial.
The State responds that a ministerial error occurred and the trial court did not intend to grant a new trial. It contends that, on February 12, 2007, the trial court vacated the order granting defendant a new trial since the order was signed in error, making this assignment of error now moot.
On September 15, 2006, the trial court denied defendant's motion for post-verdict judgment of acquittal and sentenced defendant. Defendant orally gave his notice of intent to appeal and then filed a written motion for appeal on September 18, 2006. On September 20, 2006, defendant filed a motion for new trial. Defendant's motions for appeal and for a new trial were granted on September 25, 2006.
On February 21, 2007, the State filed a motion to supplement the record to include the State's Motion for Clarification filed February 9, 2007 and the February 12, 2007 minute entry in which the trial court vacated the order granting defendant a new trial. Supplementation was granted by this Court.
The February 12, 2007 minute entry explains that the trial court assumed the order was to "show cause" for a hearing when it was signed. As such, the trial court ordered that the order granting a motion for new trial be vacated and marked denied.
LSA-C.Cr.P. art. 916 provides in pertinent part,
The jurisdiction of the trial court is divested and that of the appellate court attaches upon the entering of the order of appeal. Thereafter, the trial court has no jurisdiction to take any action except as otherwise provided by law and to:
. . . .
(2) Correct an error or deficiency in the record.
*1039 We find that the trial court retained jurisdiction to rescind the order granting the new trial motion pursuant to LSA-C.Cr.P. art. 916 and State v. Williams.[22] In State v. Williams,[23] the Louisiana Supreme Court determined the granting of the new trial in that case was a ministerial error and held that the error could be corrected to have the record accurately reflect the district court proceedings.
Moreover, defendant filed his motion for new trial after his sentence was imposed, arguing that the verdict was contrary to the law and the evidence and that the ends of justice would be served by the granting of a new trial. As provided in LSA-C.Cr.P. art. 853, a motion for new trial on these grounds must be filed and disposed of before sentencing. Even though the motion for new trial was inadvertently granted, we find the motion for new trial was untimely filed since it was filed after sentencing.

ERROR PATENT DISCUSSION
The defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux,[24] and State v. Weiland[25] regardless of whether defendant makes such a request. The following matter is noted:
It does not appear Durand was notified of the two-year prescriptive period for filing an application for post-conviction relief in accordance with LSA-C.Cr.P. art. 930.8. Accordingly, we remand and instruct the trial court to inform defendant of the two-year prescriptive period by sending written notice to defendant within ten days after the rendition of the appellate opinion and to file written proof in the record that defendant received said notice.[26]
Accordingly, for the foregoing reasons, defendant's conviction is affirmed, and we remand for further proceedings consistent with this opinion.
AFFIRMED; REMANDED.
NOTES
[1] LSA-C.Cr.P. art. 821(B).
[2] LSA-C.Cr.P. art. 821(C) and (E).
[3] 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
[4] State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833 (citation omitted).
[5] Id.
[6] Id. (quotation omitted).
[7] State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208 (citations omitted).
[8] State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056 (citation omitted).
[9] LSA-R.S. 14:30.1(A).
[10] State v. Gant, 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111 (citation omitted).
[11] LSA-R.S. 14:10(1).
[12] Id. (citation omitted).
[13] Id. (citation omitted).
[14] A defendant can claim the murder was committed in self-defense, i.e., that the homicide was justifiable "[w]hen committed . . . by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." LSA-R.S. 14:20. In a homicide case, when a defendant claims self-defense the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Gant, 942 So.2d at 1111 (citation omitted).
[15] LSA-C.E. art. 401.
[16] LSA-C.E. art. 402.
[17] LSA-C.E. art. 403.
[18] State v. Battaglia, 03-692 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, 710, writ denied, 04-1701 (La.4/29/05), 901 So.2d 1058 (citation omitted).
[19] State v. Condley, 04-1349 (La.App. 5 Cir. 5/31/05), 904 So.2d 881, 892-893, writ denied, 05-1760 (La.2/10/06), 924 So.2d 163 (citations omitted).
[20] State v. Battaglia, 861 So.2d at 711 (citation omitted).
[21] State v. Jones, 99-798 (La.App. 5 Cir. 11/10/99), 748 So.2d 1176, 1179, writ denied, 00-0306 (La.12/8/00), 775 So.2d 1076 (citation omitted).
[22] 01-0554 (La.5/14/02), 817 So.2d 40.
[23] Id. at 47-48.
[24] 312 So.2d 337 (La.1975).
[25] 556 So.2d 175 (La.App. 5 Cir.1990).
[26] See, State v. Vance, 06-465 (La.App. 5 Cir. 12/12/06), 948 So.2d 1106, 1112.