SUSAN M. CHEHARDY, Chief Judge.
|20n appeal, defendant challenges his conviction for second degree murder. For the following reasons, we affirm defendant’s conviction and sentence.

Procedural history

On August 16, 2006, the Grand Jury for the Twenty-Third Judicial District indicted defendant on one count of first degree murder, in violation of La. R.S. 14:3o.[1] On June 2, 2009, the State amended the indictment to charge defendant with one count of second degree murder, in violation of La. R.S. 14:30.1. Defendant was arraigned on the amended bill on June 16, 2009, and pled not guilty.
On June 22, 2009, the matter proceeded to trial before a twelve-person jury, which, after a four-day trial, found defendant guilty as charged. On September 9, 2009, the trial judge sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence to run consecutively to sentences defendant was already serving. That day, defendant made an oral |,.¡motion for reconsideration of sentence that was denied and filed a timely motion for appeal, which was granted.

Facts

At trial, Sierra Williams testified that, on December 3, 2005, her boyfriend, Kee-lan Irvin, worked from 7:00 a.m. to 7:00 p.m. Between 7:30 p.m. and 7:40 p.m., Williams called Irvin, who indicated that was on his way to wash his truck — a blue 2002 Chevrolet Avalanche with unique 26" rims on the tires — at a carwash in Gonzales, Louisiana. Although Irvin said that he would call her right after he washed his truck, Sierra Williams never heard from her boyfriend again. When Williams tried to call him, he did not answer; when she texted him twice, he did not respond.[2]
At about 8:00 or 8:05 p.m., Chris Williams, a neighbor of Irvin’s, saw Irvin’s distinctive truck headed southbound on Louisiana Highway 44 in Gonzales. Williams traveled southbound on Highway 44 next to Irvin’s Avalanche and observed Irvin riding in the passenger seat. Williams could not see who was driving Irvin’s Avalanche. Williams eventually turned off of Highway 44 but noticed that Irvin’s truck kept heading south on Highway 44 toward 1-10.
When Irvin did not come home that night, which was unusual, Sierra Williams *946 contacted Irvin’s family, who reported him missing the next morning, December 4, 2005.
Detective Juliet Zeringue of the St. James Parish Sheriffs Office (“SJPSO”), testified that, on December 4, 2005, at approximately 7:15 a.m., she was dispatched to a cane field on Bessie K Road in Vaeherie to investigate an abandoned vehicle. Upon arrival, Detective Zeringue observed a blue Chevrolet pAvalanche missing both tires from the driver’s side. Detective Zeringue also observed a cinder block, a large piece of wood, and a large jack lying underneath the vehicle. Additionally, there was another piece of wood near the vehicle. She noted that both passenger side tires were still attached to the vehicle.
Detective Zeringue almost immediately noticed that there was blood on the “running board” of the passenger side of the vehicle so she began to process and photograph the vehicle as a crime scene. She swabbed the door handles for DNA then opened the vehicle’s doors. Upon looking inside the vehicle, she observed blood on the back of the front passenger seat, blood and dirt on the back seat, and “high velocity blood spatter” on the back passenger door. She testified that part of the dashboard was missing, wires were hanging out of the center console area, and the DYD/radio player system was missing.
Detective Keith Guerin of the SJPSO obtained the VIN number of the Chevrolet Avalanche to identify the registered owner. The dispatcher advised the detectives that the owner of the vehicle was Keelan Irvin, whose family had just reported him missing.
Detective Zeringue immediately processed the outside of the vehicle[3] for fingerprints and obtained four latent fingerprints, which, via emergency request, were processed by Captain Brenda Miceli of the Baton Rouge Police Department. Captain Miceli, a stipulated expert in the field of latent print examination, testified that she examined four latent prints in this matter and identified two as matching fingerprints on Terrell Stipe.
On December 5, 2005, at approximately 11:30 a.m., Detective Zeringue was notified that two of the prints belonged to Terrell Stipe, defendant herein. After | locating defendant, a St. Charles Parish detective brought him to the St. Charles Parish Sheriffs Office (“SCPSO”). At approximately 3:40 p.m., Detective Zeringue interviewed defendant at the SCPSO; her supervisor, Captain Sid Berthelot, and Chief of the Gonzales Police Department Bill Landry were present during the interview.
Prior to beginning the interview, Detective Zeringue advised defendant of his Miranda rights, which he waived in writing. Defendant told her that, on the day in question, he washed his car, cut hair, then went to two parties. When Detective Ze-ringue told defendant that his prints had been found on a blue Chevrolet Avalanche with 26" rims that had been abandoned in a cane field in St. James Parish, he denied that he had ever seen the truck. During that interview, defendant never implicated himself.
That same day, defendant’s wife, Elsie Marie Stipe, approached Detective Ze-ringue at the SCPSO. Mrs. Stipe told Detective Zeringue that defendant was not *947 home on the night of December 3, 2005 but he came home about 3:00 or 3:30 a.m. on December 4, 2005. Additionally, Mrs. Stipe noticed that there was blood on a gray sweater that he was wearing when he arrived home. Mrs. Stipe stated that defendant was also wearing a white t-shirt, black jeans, and black shoes. Mrs. Stipe further stated that, when defendant left their house the next morning to go to his father’s house, he took the gray sweater with him. Detective Zeringue obtained a taped statement from Mrs. Stipe and consent from Mrs. Stipe to a police search of her home. During the search, Detective Zeringue seized the white t-shirt, black jeans, and black shoes that defendant had been wearing on the night of December 3, 2005.
On December 6, 2005, Detective Claude Louis, Jr. of the SJPSO interviewed defendant and advised defendant of his rights, which defendant waived. The next | fiday, which was December 7, 2005, defendant gave a taped statement to Detective Louis. In his statement, defendant said he had never seen a blue Avalanche and did not know who Irvin was. Defendant stated that, on the evening of December 3, he was at a family party in Killona and that he brought his father home about 9:00 p.m. Defendant then went to Red’s Bar in Killo-na, where he stayed until 12:45 a.m. Detective Louis again told defendant that his prints were on the missing man’s Chevrolet Avalanche but defendant denied seeing or touching the vehicle.
On December 8, 2005, Detective Mike Toney of the Ascension Parish Sheriffs Office (“APSO”) interviewed defendant after advising defendant of his rights, which defendant waived in writing. When Detective Toney asked defendant to tell them where Irvin’s body was, defendant stated that he “just couldn’t find it.” Defendant also stated that if he said anything “it would open it all up.”
On December 9, 2005, based on a tip from a concerned citizen, Keelan Irvin’s body was found in a wooded area in St. James Parish off of La. Highway 641. When Irvin’s partially-clothed body was found, Detective Zeringue observed, among other things, trauma on the deceased’s back over the right shoulder blade, which appeared to be a bite mark.
Dr. Dana Ann Troxclair, who was accepted as an expert in forensic pathology, testified that she performed an autopsy on Irvin. Dr. Troxclair testified that Irvin had sustained a single, perforating gunshot wound to the right side of his head that went through the skull and brain then exited through the neck. She explained that the cause of death was extensive damage to the brain and skull, and the manner of death was homicide.
Theodore Smith testified that, on December 3, 2005, he was living in Killona and that night after dark he arrived at his house to find defendant in his ^driveway standing next to the driver’s side door of Irvin’s Avalanche. Smith did not notice anyone else in the truck. Smith knew that the truck belonged to Keelan Irvin because Irvin had bought the distinctive 26" rims on the Avalanche from Champs Automotive, where Smith works. Defendant asked to borrow a large jack from Smith, who refused. The next morning, Smith noticed that several of his jacks were gone. At trial, Smith identified the jack found in the cane field under the deceased’s Avalanche as one of the jacks taken from his home on the night of December 3, 2005.
Patrick Lane of the Louisiana State Police Crime Laboratory (“LSPCL”), who was accepted as an expert in the field of crime scene investigation, ballistics, and fingerprint collection, testified that he collected and processed evidence from the *948 Chevrolet Avalanche transported to the LSP lab by Detective Zeringue of SJPSO. In his opinion, there was evidence that at least three different shots were fired inside of the vehicle. First, there was a bullet impact on the roof of the vehicle between the rearview mirror and the passenger-side sun visor. Second, there was a bullet impact that struck the “post” between the front and back door of the vehicle; bullet fragments were recovered from that post. Third, a bullet impacted the right side of the backseat; a bullet was recovered from the “ground.”
Mr. Lane also testified that, on December 9, 2005, he went to the crime scene location where Irvin’s body was discovered and recovered a white t-shirt from the upper body and a white do-rag from the head of the deceased. The do-rag had a hole in the top front right area, which Mr. Lane testified is consistent with a contact shot. Further, the white t-shirt had residue that indicated that the shirt was pulled up or someone reached under the shirt to fire a shot. The evidence indicated that the weapon used was a .357 magnum or a .38 caliber pistol; however, he was never given a weapon to test.
IsJanaki Vaidyanathan of the LSPCL, who was accepted as an expert in DNA analysis, testified that she processed DNA evidence in this case. In her opinion, the DNA profile obtained from the stain on the bottom of defendant’s white t-shirt, the bullet, the back rest of the back seat of the Avalanche, the doorframe, the swab from underneath the driver’s door, and the blood stain from the running board were consistent with the DNA profile obtained from the victim, Keelan Irvin. She further testified that the probability that the DNA on defendant’s shirt came from someone other than the victim, Keelan Irvin, was approximately one in 10.8 trillion.
Further, Vaidyanathan testified that the DNA profile obtained from the Avalanche’s steering wheel was consistent with a mixture of DNA from at least three individuals, including defendant and Irvin. She also asserted that approximately 38.4% of the population — but not defendant and Irvin — could be excluded as possible contributors of the DNA in this mixture.
Dr. Houston Hughes, a dentist, testified that he took dental impressions of four different individuals connected with either the victim or this case. The impressions were labeled A, B, C, and D then turned over to Detective Zeringue, who forwarded them for examination by 2 expert forensic odontologists. The impressions of defendant’s teeth was the set labeled “C.”
Dr. Robert Barsley, a forensic odontologist, testified that he looked at a photograph of an injury on the victim’s back and determined that it was a human bite mark. Dr. Barsley believed that the bite mark occurred within a short period of time before the individual was killed. After reviewing the dental impressions provided, Dr. Barsley was able to determine that neither “A,” nor “B,” nor “D” could have made the bite mark, but that “C” could have left the mark. Dr. Barsley asserted that “C” had some teeth that were badly out of line, which paralleled the 19bite mark on the victim’s back. Dr. Barsley explained that “C” ’s lower teeth were fairly unusual in their arrangement, which matched the crookedness of the injury.
Dr. Paul Stimpson, a second forensic odontologist, testified that he was forwarded some dental impressions labeled “A,” “B,” “C,” and “D” and a photograph of the suspected bite mark on the victim’s back. After studying the material, he concluded that only “C” could not be excluded as having made the bite mark but that the other individuals could be excluded. Dr. *949 Stimpson asserted it was “highly probable -that [C] did” make the bite mark on the victim.
After the State rested its case, defense counsel called eight witnesses who were all family members of defendant: defendant’s father, Raymond Lockett; defendant’s sister, Dawn Stipe; defendant’s cousins, Dina Louis, Patricia Lockett, Keandra Lockett, Leshaunte Lockett, Melissa Lockett, and Renaunte Lockett. The witnesses all testified that, on December 3, 2005, defendant was present at a birthday party at Patricia Lockett’s house in Killona. They all identified photographs of that party and agreed that defendant was wearing a white t-shirt at the party that night. Defendant’s father specifically testified that defendant arrived at the party at approximately 4:00 to 4:30 p.m. and left at approximately 9:15 p.m. to drive him (his father) home. However, Renaunte Lockett did not know if defendant was there the entire time. Dina Louis did not know when defendant arrived and left. Finally, both Dawn Stipe and Patricia Lockett did not know what time defendant left.
After hearing all of the testimony and evidence, the jury unanimously found defendant guilty as charged of second degree murder.

Law and Argument

On appeal, defendant raises three assignments of error: first, the court erred when it allowed the defendant’s statements in evidence; second, the court erred by 110not following the procedure and not providing money for expert witnesses; and third, the evidence was insufficient to support Terrell Stipe’s conviction for second degree murder.
When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Therefore, defendant’s third assignment of error regarding the sufficiency of the evidence is addressed first.
In his third assignment of error, defendant argues that the- evidence was insufficient to support his second degree murder conviction. He contends that the circumstantial evidence only showed that he may have participated in stripping the truck since his fingerprint was found on the outside of the victim’s truck, the victim’s blood that was found on defendant’s t-shirt could have come from the blood on the outside of the truck, and the bite mark on the victim was only a possible match to defendant’s tooth pattern. Additionally, defendant asserts that he provided many alibi witnesses who testified that he was at a family gathering the night that the victim was abducted and murdered.
The State responds that the evidence, when viewed in the light most favorable to the prosecution, amply supports defendant’s conviction beyond any reasonable doubt and excludes any other reasonable hypothesis of innocence.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the | ¶ \ crime beyond a reasonable doubt. See State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); *950 State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts. State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La. R.S. 15:438.
On appeal, the reviewing court does not determine if another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. Instead, the appellate court must evaluate the evidence in the light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Durand, 07-4 (La.App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034, writ denied, 07-1545 (La.1/25/08), 973 So.2d 753. The reviewing court must not impinge on the jury’s finding of fact, in a criminal case, except to the extent necessary to guarantee constitutional due process. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83.
|¡ ¡/Under La. R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. See State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-757 (La.12/15/06), 944 So.2d 1277.
According to the jury instructions, the State prosecuted this case under both theories of murder: specific intent murder and murder while committing or attempting to commit aggravated kidnapping, second degree kidnapping, armed robbery, first degree robbery, or simple robbery.
Under the “specific intent” theory of second degree murder, the State had to prove that defendant had the specific intent to kill or to inflict great bodily harm. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). The determination of specific intent is a question of fact. State v. Durand, supra.
Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person, State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 585, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07), 958 So.2d 24, 27, and from the extent and severity of the victim’s injuries, State v. Stacker, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, 606, writ denied, 03-411 (La.10/10/03), 855 So.2d 327. See also State v. Gonzalez, 07-449 (La.App. 5 Cir. 12/27/07), 975 So.2d 3, 8, writ denied, OS-228 (La.9/19/08), 992 So.2d 949 (“The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill.”).
*951 11 aHere, the evidence reflects that at least three different gunshots were fired inside of the victim’s Chevrolet Avalanche. Further, the evidence shows that the victim sustained a point-blank gunshot wound to his head, which caused extensive damage to the brain and skull resulting in his death.
Additionally, there is strong evidence that defendant was the individual who shot the victim. First, defendant’s fingerprints were found on the outside of the Avalanche and DNA consistent with his DNA was found on the vehicle’s steering wheel. Second, blood containing the victim’s DNA was found on the white t-shirt that defendant was wearing on December 3, 2005. Third, defendant’s unusual teeth arrangement matched the bite mark on the victim’s back, which, according to uncontro-verted expert testimony, was made very near the time of the victim’s death. Finally, a witness testified that defendant was driving the victim’s truck on the night the victim’s went missing.
Applying the legal principles to the evidence in this case, we find that a rational trier of fact could have found that the State carried its burden of proving beyond a reasonable doubt that defendant acted with specific intent to kill or inflict great bodily harm. Because the evidence is sufficient to convict defendant under the specific intent theory of second degree murder, there is no need to determine whether the State presented sufficient evidence of felony murder.
Defendant further argues that he provided an alibi for the time of the kidnapping and murder through witnesses who testified that he was at a family party in Killona. Nevertheless, the jury apparently rejected the testimony of defendant’s alibi witnesses and accepted the testimony of the State’s witnesses. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, | uthe credibility of witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
In light of the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support defendant’s second degree murder conviction. This assignment of error lacks merit.
Returning now to defendant’s first assignment of error, defendant argues that the trial judge erred by denying his motion to suppress his statements. He contends that his statements were not freely and voluntarily given because numerous, skilled police officers used improper questioning techniques and failed to ensure that he understood what rights he was waiving as required by Miranda,[4] He asserts that the trial judge erroneously shifted the burden of proof of the voluntariness of his statement to him rather than the State. Defendant also asserts that the officers delayed arresting him so he could be held in custody and interrogated outside the presence of an attorney to avoid the hearing required by La.C.Cr.P. art. 230.1.
The State has the burden of proving the admissibility of a purported confession or statement by the defendant. State v. Arias-Chavarria, 10-116 (La.App. 5 Cir. 9/28/10), 49 So.3d 426, 433, writ denied, 10-2432 (La.2/25/11), 58 So.3d 460 (citing La.C.Cr.P. art. 703(D)). Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove, beyond a *952 reasonable doubt, that the defendant was first advised of his Miranda rights, that he voluntarily and intelligently waived them, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements, or promises. State v. Loeb, 09-341 (La.App. 5 Cir. 2/23/10), 34 So.3d 917, 924-25, writs denied, 10-681 (La.10/15/10), 45 So.3d 1110; 13-1754 (La.5/2/14), 138 So.3d 1237.
1 ^Determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. The admissibility of a confession or statement is a determination for the trial judge, and the judge’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight, and will not be overturned, unless unsupported by the evidence. State v. Arias-Chavarria, 49 So.3d at 433. Testimony of the interviewing police officer alone may be sufficient proof that a defendant’s statements were freely and voluntarily given. Id.
To determine whether the trial court’s denial of a motion to suppress is correct, the appellate court may consider the evidence adduced at the suppression hearing as well as the evidence presented at trial. State v. Addison, 05-378 (La.App. 5 Cir. 12/27/05), 920 So.2d 884, 890, writ denied, 06-1087 (La.11/9/06), 941 So.2d 36.
On May 27, 2009, the State noticed its intent to use any and all inculpatory/excul-patory oral or written statements and/or confessions made by defendant on or between August 1, 2006 through June 22, 2009. Defendant moved to suppress his statements as illegally and unlawfully obtained.
On June 11, 2009, the State specified that it intended to use statements and/or confessions made by defendant to Detective Zeringue on or about December 5, 2005; to Detective Louis on or about December 7, 2005; and to Detective Toney on or about December 8, 2005, along with any voice recordings of defendant from December 4, 2005 to the present. On June 16, 2009 and June 22, 2009, suppression hearings were held.

December 5, 2005 statement to Detective Zeringue

Detective Zeringue testified at the suppression hearing and at trial regarding a statement defendant made on December 5, 2005, at approximately 2:00 to 3:00 |1(;p.m. at the St. Charles Parish Sheriffs Office. Prior to speaking to defendant, she read him his Miranda rights.
At the suppression hearing, Detective Zeringue identified the St. Charles Parish waiver of rights form that defendant initialed and she signed. She stated that she read the form to defendant, who initialed that he understood his rights. Detective Zeringue testified that defendant voluntarily spoke to her and that she did not do anything to force him to speak to her.
Defendant told her that, on the day in question, he washed his car, cut hair, then went to two family birthday parties. When defendant was told that his fingerprints had been found on a truck — a light blue Avalanche with twenty-six inch rims, he denied ever seeing or touching that truck. In that interview, defendant never implicated himself in any way.
On June 16, 2009, the trial judge issued a written judgment denying the motion to suppress defendant’s December 5, 2005 statement to Detective Zeringue.
First, defendant’s statement was not in-culpatory. Next, the trial judge’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled *953 to great weight and will not be overturned unless unsupported by the evidence. State v. Arias-Chavarria, supra. The trial judge’s ruling is entitled to great weight and we see no reason to disturb that ruling.

December 7, 2005 statement to Detective Louis

Next, Detective Louis testified that he took a formal statement from defendant on December 7, 2005. He explained that, on December 6, 2005, he advised defendant of his “statement of rights and waiver of rights,” after which defendant signed both sections of the statement of rights form.
117The next day, prior to taking the recorded statement, Detective Louis asked defendant if he had advised him of his rights, but defendant said, “no.” However, when Detective Louis showed defendant the form with his signature, defendant stated, “yes,” and that he did understand his rights. Defendant acknowledged that he remembered signing the form the day before. Afterward, defendant did not invoke his right to remain silent, but rather, he continued to talk voluntarily.
Detective Louis ascertained that defendant had the ability to understand the waiver of rights form by asking his educational level, which he noted at the bottom of the form as, “Attended Hahnville High School, 1995.” Defendant also told the detective that he understood his rights. Detective Louis asserted that he did not do anything to force or coerce defendant into making the statement and that the statement was voluntarily and intelligently made in his opinion.
In his statement to Detective Louis, defendant indicated that, on December 3, 2005, he went to a party at Patricia Lock-ett’s house where he stayed from approximately 4:00 p.m. until 8:00 p.m. After that, defendant drove around Killona by himself. At approximately 9:15 p.m. to 9:30 p.m., he went back to the party to pick up his father and bring him home from that party. After he dropped his dad off, he went by himself to Red’s Bar where he stayed until approximately 2:30 a.m. He denied driving a blue Chevrolet Avalanche truck that evening even though a witness placed him in that vehicle.
On June 16, 2009, the trial judge issued a written judgment denying the motion to suppress defendant’s December 6 and 7, 2005 statements to Detective Louis.
Again, the trial judge’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the |1sevidence. State v. Arias-Chavarria, supra. The trial judge’s ruling is entitled to great weight and we see.no reason to disturb that ruling.

December 8, 2005 statement to Detective Toney

On June 22, 2009, after trial had commenced, the trial court heard the motion to suppress defendant’s December 8, 2005 statement to Detective Toney of the Ascension Parish Sheriffs Office. Detective Toney testified that, when he interviewed defendant, Detectives Eric Villavasso and Darryl Brinn were also present.
Detective Toney testified that, before the interview, defendant was read his Miranda rights and appeared to understand them. He further testified that defendant signed the Ascension Parish Sheriffs Office waiver of constitutional rights form on December 8, 2005, indicating that he understood his rights and was waiving them.
Detective Toney testified that he did not force or coerce defendant to speak with him, and that defendant appeared to know *954 ingly, intelligently, and voluntarily waive his right to counsel at that time. He further testified that later on in the interview, defendant invoked the right to counsel so they stopped questioning him. Detective Toney explained that defendant was under arrest at the time for unrelated felonies but defendant’s statements were not tape-recorded.
When Detective Toney asked defendant where Irvin’s body was, defendant responded that he “could not find it.” When Detective Toney asked defendant again where the body was, defendant replied that he “couldn’t do it” because they had previously read him his rights and if he did that it would “just open it all up.”
Following Detective Toney’s testimony, the trial judge denied the motion to suppress the statement given by defendant to Detective Toney. On June 22, 2009, defendant filed a writ application with this Court seeking review of the trial judge’s |19denial of his motion to suppress his statements. On that same date, this Court denied the writ, finding that defendant did not submit sufficient evidence in the writ application to set aside the trial .judge’s ruling. State v. Stipe, 09-459 (La.App. 5 Cir. 6/22/09) (unpublished writ disposition). The Louisiana Supreme Court denied writs of certiorari on that matter. State v. Stipe, 09-1378 (La.6/23/09), 11 So.3d 491 (unpublished writ disposition).
The prior denial of supervisory writs does not preclude reconsideration of the merits of an issue on appeal. State v. Castleberry, 98-1388, p. 5 (La.4/13/99), 758 So.2d 749, 755, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). However, under the doctrine of “law of the case,” an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case. The law of the case doctrine is discretionary. Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Pettus, 11-862 (La.App. 5 Cir. 5/22/12), 96 So.3d 1240, 1242-43, writ denied, 13-2522 (La.5/30/14), 140 So.3d 1169.
In the instant case, the record does not indicate that this Court’s previous ruling was patently erroneous or produced unjust results and, as such, we will not reconsider our previous ruling. Furthermore, even if we were to reconsider our previous ruling, the trial judge’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. State v. Arias-Chavarria, supra.
Here, Detective Toney testified that pri- or to his interview, defendant was read his Miranda rights and appeared to understand them. Further, defendant signed the Ascension Parish Sheriffs Office waiver of constitutional rights form, | ¡^indicating that he understood his rights and was waiving them. Detective Toney stated that he did not force or coerce defendant to speak to him, and that defendant appeared to knowingly, intelligently, and voluntarily waive his right to counsel at that time. The trial judge’s ruling is entitled to great weight and we would find no reason to disturb that ruling.
Defendant also argues that he was not afforded a timely seventy-two hour hearing pursuant to La.C.Cr.P. art. 230.1. However, an alleged violation of La. C.Cr.P. art. 230.1 is moot after conviction and sentence. See State v. Franklin, 43,-173 (La.App. 2 Cir. 9/17/08), 996 So.2d 387, 400, writ denied, 08-2371 (La.5/22/09), 9 So.3d 138 (citing State v. Durio, 371 So.2d 1158 (La.1979)).
*955 Finally, in his last assignment of error, defendant argues that the trial judge erred by denying funding for his expert witnesses and by failing to follow proper procedure with regard to that funding. He contends that he needed DNA and bite mark experts to counter the issues raised by the State. He also contends that the trial judge erred by denying his motion to continue the trial to allow further testing of the items.
The State responds that the trial judge proeedurally complied with all requirements of jurisprudence regarding funding for defendant’s expert witnesses. The State further responds that the record fails to support defendant’s contention that the trial judge denied any timely request for that funding. Lastly, the State contends that the trial judge did not abuse his discretion by denying defendant’s motion for continuance.
The record reflects that on March 4, 2008, defendant filed a “Motion to Proceed Ex Parte on Requests for Funding for Expert Assistance.” On May 6, 2008, the trial judge found defendant to be indigent. On July 7, 2008, the trial |21 judge granted defendant’s motion to proceed ex parte on requests for funding for expert assistance.
On October 15, 2008, the trial judge set the deadline for disclosure of expert reports for February 1, 2009, and he also set the Daubert[5] hearings for May 6, 7, and 8, 2009. On March 19, 2009, defense counsel told the trial judge he did not have expert reports.
On May 6 and May 12, 2009, Daubert hearings were held to determine the admissibility of expert testimony. On June 10, 2009, the trial judge issued an order allowing only the State experts to testify at trial since no defense experts appeared at the Daubert hearings.
On June 16, 2009, defendant filed a motion for continuance of trial, which was set for June 22, 2009. In that motion, defendant stated, inter alia, that he was moving for a continuance because he was still experiencing difficulties with funding as it pertained to his experts. On June 19, 2009, defendant filed a “Motion for Stay of Proceeding and Motion for Continuance.” In that motion, defense counsel said that he had secured some preliminary work from two experts; however, those experts were unwilling to move forward as they had not been paid.
At the hearing on June 22, 2009, the State said that the issues concerning the funding were ex parte matters between the court and defense counsel. The trial judge’s position with regard to funding was that he had never denied a motion for funding, other than the previous Wednesday when he told defense counsel he would not be paid for his courier. The trial judge asked defense counsel to show him an order or a letter wherein he denied funding prior to defendant’s deadline for the Daubert hearings. When defense counsel could not show any issues that were | ^raised before the deadline, the trial judge ruled that the motion was untimely and denied the motion to continue. Defense counsel objected to the trial judge’s ruling.
On June 22, 2009, defendant filed a motion to stay the trial, which the trial judge denied. That day, defehdant filed an application for supervisory writs in this Court. On June 22, 2009, this Court denied the stay order and the writ, stating in pertinent part:
*956 Relator cited State v. Jones, 1997-2593 (La.3/4/98), 707 So.2d 975, 977 to emphasize the State’s obligation to provide an indigent defendant’s counsel with the basic tools of an adequate defense at no cost to the defendant. In the writ application, Relator did not submit any evidence that 1) he is an indigent defendant and is entitled to the State’s obligation; and, 2) the trial court denied the funding for the testimony of his experts. For these reasons, the Motion for Stay is denied and the writ is denied.
State v. Stipe, 09-459 (La.App. 5 Cir. 6/22/09) (unpublished writ disposition).
In State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213, the Louisiana Supreme Court set forth the procedure to be used to seek expert funding:
... an indigent defendant may file a motion for expert funding ex parte. Notice of the filing of the motion should be given to the state, which may file an opposition to the hearing being held ex parte and/or to the request for funding. The trial court should first determine, in camera, either on the face of the allegations of the motion or upon taking evidence at an ex parte hearing, whether the defendant would be prejudiced by a disclosure of his defense at a contradictory hearing. If so, then the hearing on expert funding should continue ex parte. If not, then the hearing should be held contradictorily with the District Attorney. ...
At the hearing on expert funding, whether ex parte or contradictory, the defendant must first show a need for the funding. The defendant must show with a reasonable degree of specificity what type of expert is needed and for what purpose. In other words, the indigent defendant requesting governmental funding for the securing of expert assistance must show that it is more likely than not that the expert assistance will be required to answer a serious issue or question raised by the prosecution’s or defense’s theory of the case. If the defendant meets this burden, then the court is to order that the funds be provided by the state. If the defendant fails to meet this burden, and the proceedings were held ex parte, both the written reasons for denial and the record of the proceedings are to remain under seal during the pendency of the defendant’s prosecution, including appellate review.
Id. at 1221-22.
La.C.Cr.P. art. 707 provides that a motion for continuance shall be filed at least seven days prior to the commencement of trial. According to La.C.Cr.P. art. 712, “[a] motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor.” The Louisiana Supreme Court has consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 447, writ denied, 09-158 (La.10/16/09), 19 So.3d 473 (citing State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044, 1077, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005)). Further, the Louisiana Supreme Court generally declines to reverse convictions on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice. Id. This Court has also recognized that the denial of a motion for continuance is not grounds for reversal absent abuse of discretion and a showing of specific prejudice. Id.
Our review of the record reflects that the proper procedure for seeking funding *957 for expert witnesses under Touchet, supra, was followed. On July 7, 2008, the trial judge granted defendant’s motion to proceed ex parte on requests for funding for expert assistance. The record does not reflect that the trial judge ever denied a timely request for expert funds. Based on the foregoing, we find no abuse of the trial court’s discretion in its denial of the motion to continue trial as defendant has failed to show specific prejudice. This assignment of error lacks merit.

124Errors patent

Finally, we have reviewed the record for errors patent, according to La.C.Cr.P. art. 920. Our review reveals no errors that require correction. Defendant’s conviction and sentence are affirmed.

AFFIRMED.

. Defendant was also indicted on one count of armed robbery and one count of aggravated kidnapping, which were not tried with the murder charge and are not the subject of this appeal.

. During the investigation, the police obtained Irvin’s cell phone records, which showed that the last call he answered was from Sierra Williams’s cell phone at 7:43 p.m. on December 3, 2005, and that he had received two text messages from the same cell phone that same night.

. That day, the Chevrolet Avalanche was transported to the Louisiana State Police Crime Laboratory (“LSPCL”) in Baton Rouge for further forensic processing. As a result of that processing, Julie Bergen of the LSPCL, a stipulated expert in the field of latent print analysis, testified that she received an envelope containing eight latent lifts from the Avalanche, four of which belonged to defendant.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).