MARC E. JOHNSON, Judge.
| JMendant/Appellant, Jason L. Thomas a/k/a “Jay,” appeals his convictions and sentences for two counts of second degree murder from the 24th Judicial District Court, Division “D”. For the following reasons, we affirm Defendant’s convictions and sentences.
FACTS AND PROCEDURAL HISTORY
On April 17, 2014, a Jefferson Parish Grand Jury indicted .Defendant and code-fendant, Garard K. Achelles a/k/a “Hurk,” with two counts of second degree murder of Demektric Anderson1 and Tacara Williams-Moss, in violation of La. R.S. 14:30.1. - Defendant was arraigned on May 5, 2014 and entered a plea of not- guilty. The matter' proceeded to trial for both defendants on January 20, 2015; however, on January 22, 2015, the State and both defendants jointly moved for a mistrial, which was granted.
la A second trial commenced on May 5, 2015, as to only Defendant, before a twelve-person jury, 'At trial, Ramonica Gainey, a friend of both victims, testified regarding the events surrounding and leading up to the, murders of Demektric Anderson and Tacara Williams-Moss. She testified that she, Mr. Anderson, and Ms. Williams-Moss traveled in Ms. Williams-Moss’s black Dodge Charger from Tennessee late Saturday night and arrived in New Orleans around. 2:00 or 3:00 a.m, the morning of December 29, 2013. -After arriving, they checked into a hotel in New Orleans East. Ms. Gainey explained that the purpose behind their trip to New Orleans was to “find work to make some money” by dancing in the strip club's'in New Orleans. They stayed at the hotel in New Orleans East until checkout around 12:00 or 1:00 p.m.' and then went to another hotel, a Super 8, in Metairie. She recalled that while they were at the hotel around 4:00 a.m. on December 30, 2013, Mr.. Anderson received a phone call; Mr. Anderson relayed to Ms. Gainey and Ms. Williams-Moss that “yeah, the serve is gonna make,” which meant that he was going to sell some pills.
Eventually, all three of them left the hotel in the black Dodge Charger to meet *295 the potential buyer for the pills. Mr. Anderson drove, Ms. Williams-Moss was in the front passenger seat, and Ms. Gai-ney was in the rear passenger seat. They drove a short distance and arrived at an apartment complex. As they pulled into the apartment complex, Ms. Gainey saw a black man standing “off to the side” on the driver’s side, Mr. Anderson spoke with the man through the rolled-down driver’s side window. At some point later, Ms. Gainey noticed another black man at the rear of the car. Although she did not see either of their faces, she described the first man as a “slimmer guy” and the second man as “kind of stocky.” Ms. Gainey described that “they finished up whatever they had going on,” and then she heard someone say “is that the guy?” At that point, she heard gunshots and Uscreamed at Mr. Anderson to back up the car. She related that once they got onto the service road, Mr. Anderson collapsed, and the car crashed off, the road. After the car crashed, Ms. Gainey called 9-1-1.
Sergeant Eddie Klein, a homicide supervisor for the Jefferson Parish Sheriffs Office, testified that his squad responded to the homicides that occurred on December 30, 2013. He explained that there were two scenes involved with these homicides: the primary scene where the shooting occurred at 2508 Pasadena Avenue and the secondary scene where the incident ended by the entrance ramp near Clearview by the south service road. He testified regarding the kind of evidence that was recovered from both scenes. Sergeant Klein stated that they recovered casings, eight each, from both .45 and 9mm calibers from the primary scene. He explained that based on where the casings were found, it was consistent with gunfire coming from the driver’s side of the car, arid that based on two different calibers of casings recovered, it was indicative of more than a single gun being fired. Sergeant Klein further related, that no weapons were recovered from either the primary or secondary scene and that neither of the weapons used in the shooting were ever recovered during the course of the investigation. At the secondary scene, projectiles were recovered from inside. of the vehicle, as. well as three phones and two clear bags containing marijuana and pills later determined to be alprazolam.
Jene Rauch, a firearms and tool mark examiner with the Jefferson Parish Sheriffs Office Grime Lab, testified regarding her involvement with the case and explained the results of her ballistic analysis. She explained that for this case, she examined sixteen fired cartridge casings of two different calibers and nine fired projectiles or projectile -fragments.' Ms. Rauch testified that she was able to determine, based on the fact that the ' casings Were two different calibers, that the |Bcasings were discharged from two different firearms. At a minimum, a -.45 automatic caliber weapon and a 9 mm weapon were used in the shooting. Detective Solomon Burke with the Jefferson Parish Sheriffs Office Digital Forensics Unit testified that he analyzed multiple cell phones pertaining to this case. While he received three phones for analysis, only one was able to be analyzed: the cell phone belonging to Mr. Anderson. Mr. Anderson’s phone had five interactions with the suspect phone number 504-214-* * ⅜ * — two incoming calls and three outgoing calls. Mr. Anderson received two calls from the 214 number on December 30, 2013, the day of the murders — one at 3:01 a.m. and one at 4:58 a.m. The three outgoing calls were also on December 30, 2013 — at 5:02 a.m., 5:10 a.m., and 5:13 a.m. After the 5:13 a.m. call, there was no more outgoing activity on Mr. Anderson’s phone. The approximate time of the murders was at 5:15 a.m. the morning of December 30, 2013. Detective *296 Burke further testified that although he was unable to do a full extraction on the other phones, he was able to do a partial extraction on the SD card found on Ac-helles’ phone.
John Valenti, an employee of AT & T Mobility, testified regarding the phone records for phone number 504-214-* ⅜ * *, the su'spect phone. He testified 'that this number was not associated with an individual, but rather, was a prepaid customer. Mr. Valenti testified that the cell tower that was utilized was near the Super 8 in Metairie for all calls made by the 214 number from December 27, 2013, until December 30, 2013, except for two. Outside of those two exceptions, the first time the phone used a different cell tower was for a call made December 30, 2013, at 5:22 a.m. that utilized a tower on West Metairie. Then, the next call occurred at 5:29 a.m. and utilized a tower near Airline Highway. At 6:08 a.m. another call was placed that utilized a tower near Airline Highway that was near the London Lodge motel. At 6:24 a.m. and 6:29 a.m. two more calls were made that utilized a tower | finear the Mississippi River. The records reflect that those two calls were the last time the phone was used.
Thomas Gai, a homicide detective with the Jefferson Parish Sheriffs Office, testified regarding his involvement with the homicide investigation. He testified "that on December 30,2013, he responded to the secondary scene, off the service road near Clearview. He spoke with Ms. Gainey, the witness present at the scene, who told him that she and the two victims had gone to the scene at Pasadena to conduct a drug transaction. She told him that the suspects contacted them through Mr. Anderson’s cell phone. After obtaining warrants for the phone, Detective Gai was able to determine the phone number that contacted the victim prior to his death. Through the court order, Detective Gai determined the number was not registered to an individual and the. “live ping” attempts were unsuccessful, meaning the phone was either. turned off or it was destroyed. In trying to determine to whom the suspect phone belonged, Detective Gai did a Google search of the number that revealed that the number was listed on several ads on Backpage.com, a website that facilitates prostitution. Through the investigation, the women on the page were identified as Abby Stallworth and Calvenia Dott.
Detective Gai explained that Achelles brought Ms. Stallworth and Ms. "Dott to the LaQuinta in a 2012 blue Dodge Avenger. Achelles was arrested, and after obtaining a search warrant, Detective Gai searched the blue Dodge Avenger. He explained that pursuant to the search, he found a municipal document that indicated Defendant had appeared in court on December 30, the day of the murder. He also recovered a cell phone, later determined to be Achelles’.
Detective Gai further elaborated regarding the phone records of the suspect phone 504-214-* * * *. Through phone records, he was able to determine that the 17suspect phone had interactions with Ac-helles’ phone, Nukeita[1] Rollins, Defendant’s girlfriend’s phone, Ms. Stallworth’s phone, Ms. Dott’s phone, and Mr. Lem-mon’s phone. He also testified how the last two calls made by the suspect phone utilized towers near the Mississippi River. Detective Gai testified that he was able to place the Dodge Avenger near that location, at the intersection of Causeway and Andover through the ALPRS system.[2] *297 The license plate on the Dodge Avenger on Causeway and Andover matched the license plate of the Dodge Avenger that was confiscated from Achelles at the time of his arrest.
Detective Gai further testified regarding the phone records of Defendant. The records reflected that on the night of the murder, starting at midnight, Defendant’s girlfriend, Nukeita Rollins’, phone was used to make numerous calls to Defendant’s phone. Additionally, Defendant’s phone records reflected interactions with a number linked to the apartment complex at 2508 Pasadena Avenue, the scene of the murders. The records reflected that the number associated with the apartment complex called Defendant’s phone about fifty times from midnight until the time of the murders. Additionally, the records reflected that a number associated with the Super 8 called Defendant’s phone the night of the murders at approximately 5:30 a.m.
In furtherance of the investigation, Detective Gai obtained surveillance video from areas surrounding.both crime scenes; one camera was on Guiffrias and the other was on the corner of Pasadena Avenue and L Street. The surveillance from Guiffrias, marked as “suspects arriving on Guiffrias,” depicted a car parking on the corner- of Guiffrias and L Street and two people exiting the vehicle and then | ¿walking in the direction of Pasadena Avenue. Later in the video, it depicted one suspect running toward the vehicle, with a second suspect trailing behind. Detective Gai explained that this was significant because it corroborated Ms. Dott’s and Ms. Stall-worth’s statement regarding Achelles being faster than Defendant because Defendant injured his foot.
Calvenia Dott testified that she came to New Orleans twice in December 2013. She explained that she and Abby, Stall-worth came to New Orleans to make money by posting on Backpage.. She and Ms. Stallworth posted their pictures on the site with a phone number, as well- as their location for potential clients to contact them. Ms. Dott recounted that on her first trip, she initially met Achelles and Defendant outside of their hotel room,, the Super 8 in Metairie. She and Ms. Stall-worth exchanged phone numbers with Defendant and Achelles. Their second trip to New Orleans was after Christmas but before New Year’s Eve. They called Defendant and Achelles expressing their desire to return, and Achelles, Defendant, and Glenn Lemmon went to Mississippi and brought them back to New Orleans. She testified that on her second trip, she and Ms. Stallworth stayed at the same Super 8 in Metairie. They posted on Backpage using a phone number that was not their own; it was a flip phone that they got from “Jay and them” with the number 504-214- * * * They also posted on the site using Defendant’s phone number, 504-373_* * ⅜ *
■ While they were staying at the Super 8, before the murders occurred, Defendant bought them drugs from “the dude in the black Charger.” She explained that Defendant told her that “he met a dude at the store in a black Charger. He was staying at the Super 8. Motel [too], and he had Xanax bars.”
Ms. Dott explained-that Defendant and Achelles went to meet the “guy in the black Charger” a second time. Defendant called him setting up a place to meet [ 9him. After hanging up the phone, Ms. Dott heard Defendant say, “I’m going to go get *298 that boy.” Both Ms. Dott and Ms. Stall-worth testified that Defendant left with Achelles and took two guns with them. She stated that the phone Defendant used to call the guy in the black Charger was the flip phone she and Ms. Stallworth used to post on Backpage, and Defendant took it with him when he 'left. Once Ms. Stall-worth and Ms. Dott realized they were not returning soon, they tried to contact Defendant’s and Achelles’ phones, as well as the flip phone because the flip phone was the number they posted to Backpage with, and they would not be able to set up clients without it.
■ After Defendant and Achelles left, they did not'return to the Super 8. At some point later, Glenn Lemmon came to their room to tell them they were moving hotels; she and Ms. Stallworth left the Super 8 for another motel, the London Lodge, where Defendant, Achelles, and Mr. Lemmon were already located. While at that hotel room, Ms. Dott stated they were watching the news on television, which had coverage regarding a murder that happened near the Super 8 involving a black Charger. She stated that she heard Defendant say, “I killed that boy.” Ms. Dott also heard Defendant express concern when learning about a third person who was in the car by stating that he did not know another person was present in the car Ms, Dott also testified that Defendant complained about injuring his foot. Further, she testified that she heard either Defendant - or Ac-helles say that the flip phone was gone because they threw it in the river.
Abby Stallworth testified that, before the murders occurred, Defendant told Ac-helles that he saw “some weed and money and stuff’ in the black Charger, and he “wanted to rob him.” In corroboration with Ms. Dott’s. testimony, Ms. Stallworth also. testified that she heard Defendant say, “I shot that boy,” referring to the coverage of the murder that happened near the Super 8 involving a black | ipCharger. Ms. Stallworth similarly testified that she heard Defendant and Ac-helles say the phone was “swimming with the fishes.” Since the flip phone — the phone they were using to ’ set up their Backpage ad — was no longer available, they used their own phones. Ms. Stall-worth further testified that they moved from the London Lodge to another hotel downtown. After' the hotel downtown, they moved locations again. Subsequently, they received a call from a client, asking them to meet at the LáQuinta Inn. Achelles transported Ms. Dott and Ms. Stallworth in “the same blue car.” Unbeknown to her at the time, the client calling them to meet at the LaQuinta Inn was Officer Keith Locascio, with the vice squad at Jefferson Parish Sheriffs Office, who set up the sting operation at the request of Detective Gai. Ms. Stallworth and Ms. Dott were ultimately arrested and brought to the police station to be interviewed.
Lawrence Brookes, an employee of Fiat Chrysler Automobiles was qualified as an expert in mechanical engineering and automotive design. He testified that he was asked to review video and still photographs of the surveillance footage recovered from the areas surrounding both crime scenes to analyze what type of vehicle was shown in the video. After reviewing the footage, Mr. Brookes concluded that the vehicle- was a Dodge- Avenger.
Mariana Easerman, a deputy coroner and forensic pathologist with the Jefferson Parish Coroner’s Office, testified that she conducted the autopsy on Demektric Anderson. She testified that there were a total of five gunshot wounds, one entered on the left side of the neck, three entered through the chest, and one entered on the right arm. She explained that based on the lack of stippling, the shooter was two *299 to three feet away from the victim. She concluded that the cause of death was two of the gunshot wounds to the chest.
luMs. Easerman testified that she also conducted the autopsy on the second victim, Tacata Williams-Moss, She testified that there were a total of four gunshot wounds — two that struck the neck area and two to the chest. Ms. Easerman stated that two projectiles were recovered from the victim’s-body. She determined that Ms. Williams-Moss’ cause of death was the gunshot wound that struck vital organs in her chest. Like Mr. Anderson, because of the lack of stippling, Ms. Easer-man concluded that the shooter was about two to three feet away. As to both victims, she testified that the majority of the gunshot wounds were on the left side of the bodies. Additionally, no gunshot wounds were below the waist, which was consistent with someone being seated in a vehicle.
Defendant first presented the testimony of Keith Loeascio, a vice squad officer with the Jefferson Parish- Sheriffs Office. He testified that he was contacted by homicide detectives to assist in one of their investigations. Officer Loeascio testified that he set up the sting operation involving Ms. Stallworth and Ms. Dott and explained the specifics of what happened leading up to their arrest. He testified that after their arrests, Ms. Stallworth and Ms. Dott,- in describing who they arrived with, indicated that Achelles received a portion of the money from each of their “dates.”
Johnny' Smithey testified that on December 30, 2013, he lived at 2325 Pasadena Avenue, which is on the cornér of Pasadena and L Streets. He stated that on that morning, at approximately 5:15 a.m., he was awoken by the sound of gunshots. Looking out his'- door, he witnessed two subjects walking down the sidewalk heading to a vehicle. Mr. Smithey stated that “to [his] knowledge, it was a blue Nissan” because he “saw a grill emblem.” He testified that on the day of the murders, he spoke with Detective Rhonda Goff and he' related what he witnessed and told her he was “pretty sure” it was a -Nissan vehicle.
| iaDebra Rollins, the mother of Defendant’s girlfriend, testified that she was “in and out” of her home on December 29, 2013. She testified that at that timé, Defendant lived with her and her daughter. When questioned regarding Defendant’s whereabouts on the day of the murders, Debra Rollins responded, “to my knowledge he.was at my house.” She testified that she had a habit-of checking on her kids by opening the door to their rooms, and when she came back home around 11:00 p.m. on December 29, 2013, “everybody was still in their room asleep.” She further testified that Defendant was in her house at 3:00 a.m. and when she woke up for breakfast the next, morning around 8:00 a.m.
Nukeitá Rollins, Defendant’s girlfriend and mother of his two children,-.testified that on December" 29, 2013, she was at home, ' Although she did not recall when Defendant arrived home, she testified that after arriving, he did not leave the house until early the next" day because he had to go to court. She testified that Defendant was with her at the time of the murdérs. On cross-examination, the State questioned Ms. Rollins, using her phone records, regarding phone calls made to Defendant’s phone from shortly after midnight' until before 6:00 a.m. on the day of the murders. She testified that she did not remember calling Defendant.
Defendant took the stand to testify in his defense. He testified that in 2013 he was living with his girlfriend-'arid her mother and was working at the Le Pavilion Hotel and Hyatt-Regeney downtown. *300 He stated that he first met Achelles through Mr. Lemmon. They told him that they knew each other because they were “upstate together in jail.” In the summer of 2013, he would regularly see and hang out with Achelles and Mr. Lemmon. Around that time, Defendant admitted he started to deal drugs with Achelles and Mr. Lemmon.
Defendant recalled that he first met Ms. Dott and Ms. Stallworth in December 2013 at the Super 8 motel. He testified that after Christmas, he, |1sAchelles, and Mr. Lemmon went to Mississippi in Mr. Lem-mon’s rental car, a blue Dodge Avenger, to pick up the girls and bring them back to New Orleans. He testified that he did not know that Ms. Stallworth, and Ms. Dott were prostitutes until Achelles told him they were on Backpage. He testified that on the evening of December 29, 2013, he was with Achelles and his girlfriend, Mr. Lemmon and his girlfriend, Ms. Stallworth and Ms. Dott at the Super 8 hotel. He testified that Achelles brought him home around 11:00 p.m. that night. He denied contacting anyone to buy drugs that night and stated that if he had bought drugs, it would have been from someone he knew. Defendant testified that on that night, he and Nukeita Rollins were taking turns taking care of their baby. He stated that he left his phone with Ms. Stallworth and Ms. Dott and that he used Nukeita Rollins’ phone to call his phone “numerous” times that night. He explained that Nukeita Rollins was “good at detecting stuff,” so he was calling the girls to alert them to not pick up the phone when they saw Nukeita Rollins calling, so he would not get in trouble with her.
The next morning, Achelles picked Defendant up in the blue Dodge Avenger to bring him to court. However, they first stopped at the London Lodge, where Ms. Dott and Ms. Stallworth were; Mr. Lem-mon arrived shortly thereafter. Mr. Lem-mon expressed that they “turned up last night, son” and told Defendant that he would pay for his fine at court. Mr. Lem-mon brought Defendant to court, and Defendant'stated that he did not finish until around 2:00 p.m. After he was finished, Achelles and Mr. Lemmon picked him up, and they “drove around .... making sales.” He denied watching TV news or reading any internet news articles while at the London Lodge. Defendant further denied that anyone made any comments about killing anyone. He testified that after December 30, 2013, they switched hotels again. Defendant testified that it came as a shock when |14he learned Achelles was charged with two counts of second degree murder. After he learned that he was being charged as well, he hired an attorney and he turned himself in.
At the conclusion of the trial, the jury found Defendant guilty as charged on both counts of second degree murder. On May 19, 2015, Defendant filed a motion for new trial, which was heard and denied on May 27, 2015. After delays were waived, the trial court sentenced Defendant to life imprisonment without the benefit of probation, parole, or suspension of sentence on both counts, which were to run consecutively. On June 11, 2015, Defendant filed a motion for appeal, which was granted on June 15, 2015. The instant appeal followed.
ASSIGNMENTS OF ERROR
On appeal, Defendant alleges: 1) the trial court erred in allowing Lawrence Brookes to qualify as an expert and give expert testimony; 2) the trial court erred in denying his motion for new trial based on insufficient evidence; and 3) the trial court imposed an excessive sentence.
*301 LAW AND ANALYSIS
Denial of Motion for New Trial[3]
In this assignment of error, Defendant argues that the trial court erred in denying his motion for a new trial because the evidence presented by the State at trial was legally insufficient to support the conviction. He argues that the State did not prove that he was the one that committed these crimes. Defendant avers that, he brought forth a reasonable hypothesis of his innocence. Because identity was |1Bnot proven by a reasonable doubt, Defendant contends that the trial court erred in denying his motion for a new trial.
The State responds that although the evidence presented at trial was circumstantial, it was sufficient to support Defendant’s identification as one of the perpetrators, as well as the conviction for second degree murder. It contends that the jurors had a rational basis for rejecting Defendant’s feeble alibi and could have easily found Defendant had the specific intent to kill the victims and/or killed the victims during the course of an attempted armed robbery. In viewing the evidence in the light most favorable to the State, it avers that any rational trier of fact could have found beyond a reasonable doubt that Defendant was guilty of second degree murder.
A motion for a new trial is based on the supposition that injustice has been done to the defendant, and unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. La.C.Cr,P. art. 851. The trial court’s ruling on a motion for a new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Delagardelle, 06-898 (La.App. 5 Cir. 4/11/07); 957 So.2d 825, 829, writ denied, 07-1067 (La.11/21/07); 967 So.2d 1154. On motion of the defendant, the court shall grant a new trial whenever the verdict is contrary to the law and the evidence. La.C.Cr.P. art. 851(B)(1). When a motion for a new trial is based on the verdict being contrary to the law and the evidence, there is nothing for review on appeal. State v. Condley, 04-1349 (La.App. 5 Cir. 5/31/05); 904 So.2d 881, 888, writ denied, 05-1760 (La.2/10/06); 924 So.2d 163. However, both the Louisiana Supreme Court and this Court have addressed the constitutional issue of the sufficiency of the evidence under this circumstance. Id. Therefore, the denial of Defendant’s motion for a 11finew trial based on the sufficiency of the evidence can be addressed by this Court on review.
In reviewing the sufficiency of evidence, an'appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. *302 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts. State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01); 806 So.2d 718, 722. The rule as to circumstantial evidence is “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable .doubt. State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83.
'This directive that the evidence be viewed in the light most favorable, to the prosecution requires the reviewing court to defer to the actual trier of fact’s rational credibility calls, evidence weighing, and inference drawing. State v. Caffrey, 08-717 (La.App. 5 Cir, 5/12/09); 15 So.3d 198, 202, writ denied, 09-1305 (La.2/5/10); 27 So.3d 297. This deference to the fact-finder does not permit a previewing court to decide whether it believes a witness or Whether the conviction is contrary to the weight of the evidence. Id. Indeed, a reviewing court errs' by substituting-its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See State v. Callo-way, 07-2306 (La.1/21/09); 1 So.3d 417, 418. As a result, under the Jackson standard, a review of the record for sufficiency of the evidence does not require’ the reviewing court to determine whether the evidence at the trial' established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08); 985 So.2d 234, 240.
In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. Caffrey, supra. Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. See State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04); 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04); 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Thus, in the absence of internal contradiction or irreconcilable ' conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact; is sufficient to support a conviction. State v. Dixon, 07-915 (La.App. 5 Cir. 3/11/08); 982 So.2d 146, 153, writ denied, 08-0987 (La.1/30/09); 999 So.2d 745.
In the matter at bar, Defendant was convicted of the second degree murders of Demektric Anderson and Tacara Williams-Moss, in .violation of La. R.S. 14:30.1. Under La. R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender:" 1) has specific intent’ to kill or to inflict ’ great pbodily harm, or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including but not limited to aggravated burglary, armed robbery, first degree robbery, second degree robbery, and simple robbery, even though *303 he has no intent to kill or to inflict great bodily harm. See State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05); 917 So.2d 583, 589-90, writ denied, 06-0757 (La.12/15/06); 944 So.2d 1277. According to the jury instructions, the State prosecuted the present case under both theories of murder for both counts: specific intent murder and murder while committing or attempting to commit armed robbery.
Under the first theory of second degree murder, the State had to prove that Defendant had the specific intent to kill or to inflict great bodily harm. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). The determination of specific intent is a question of fact. State v. Durand, 07-4 (La. App. 5 Cir. 6/26/07); 963 So.2d 1028, 1034, writ denied, 07-1545 (La.1/25/08); 973 So.2d 753. Specific intent may be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. Durand, 963 So.2d at 1034. Further, a specific intent to kill may be inferred from the intentional use of a deadly weapon such as a knife or gun. State v. Cochran, 09-85 (La.App. 5 Cir. 6/23/09); 19 So.3d 497, 508, writ denied, 09-1742 (La.3/26/10); 29 So.3d 1249; see also State v. Gonzalez, 07-449 (La.App. 5 Cir. 12/27/07); 975 So.2d 3, 8, writ denied, 08-228 (La.9/19/08); 992 So.2d 949 (“The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill.”).
1, ¡(Under the second theory of second degree murder, the State had to prove that Defendant was engaged in the perpetration or attempted perpetration of armed- robbery, even though he had no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(2); see also State v. Seals, 09-1089 (La.App. 5 Cir. 12/29/11); 83 So.3d 285, writ denied, 12-0293 (La.10/26/12); 99 So.3d 53, cert. denied, — U.S. —-, 133 S.Ct. 2796, 186 L.Ed.2d 863 (2013). Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64. A dangerous weapon- “includes any ;,. instrumentality, which, in the ■ -manner used, is calculated dr likely to produce death or great bodily harm.” La. R.S. 14:2. A gun used in connection with a robbery is, as a matter of law, a dangerous weapon. State v. Mason, 10-284 (La.App. 5 Cir. 1/11/11); 59 So.3d 419, 425, writ denied, 11-0306 (La.6/24/11); 64 So.3d 216. Furthermore, the act of pointing a gun at a victim is sufficient to prove the required element of force or intimidation for purposes of armed robbery. Id.
Here, Defendant is not contesting sufficiency as to the, essential statutory elements of the offense but rather challenges his identification as the perpetrator of the crimes. In addition to proving each statutory element of the crime charged, the State must also prove the identity of the perpetrator. State v. Williams, 08-272 (La.App. 5 Cir. 12/16/08); 3 So.3d 526, 529, writ denied, 09-0143 (La.10/16/09); 19 So.3d 470. Thus, in order to carry its burden of proof, the State was required to negate any reasonable probability of misidentification. Id. Positive identification by only one witness is sufficient to support a conviction. Id.
Defendant maintains that he was at home with his girlfriend the night of the murder. In support of his alibi, he pre *304 sented the testimony of his girlfriend, Nu-keita Rollins, and her mother, Debra Rollins. Defendant also testified, on hisj^own behalf. He denied killing the two victims and claimed that, in accordance with the testimony of his girlfriend and girlfriend’s mother, he was home at the time of the murder. However, although both women testified that he was at home at the time of the murders, Nukeita Rollins testified that she was not awake all night. Additionally, she could not explain why her cell phone number continuously called Defendant’s phone throughout the early morning hours the day of the murder, when according to her testimony, Defendant was sleeping with her. Although Defendant testified that he used her phone that night to call his phone he loaned to Ms. Stallworth and Ms. Dott, this is contradicted by Ms. Stall-worth and Ms. Dott’s testimony that they were calling Defendant on his phone because he had the phones they used to post on Backpage.
In contrast to Defendant’s alibi evidence, the State presented the evidence of Ms. Stallworth and Ms. Dott, who contended they were with Defendant in the timeframe leading up to and following the murders. Both, women testified that Defendant and Achelles took a gun with them to meet the victims to conduct a drug transaction and, perhaps, rob the victims. This is corroborated by the finding of two different caliber casings found at the crime scene, as well as Ms. Gainey’s testimony that they were going to meet someone that Mr. Anderson talked with to sell pills. Both women testified that after the murders took place, they heard Defendant make a statement to the effect that he “killed' that boy.” The suspect phone, which was used to' contact the victims shortly before they weré murdered, was linked to Defendant. These phone records corroborated Ms. Dott’s- and Ms. Stall-worth’s testimony that Defendant contacts ed Mr. Anderson to set up the drug deal and potential robbery. Further, the suspect phone last utilized a cell phone tower near the Mississippi River, which was consistent with the women’s | ¾1 testimony that they heard Defendant say they got rid of the phone by throwing it in the river.
In addition to the witnesses’ testimony, a blue Dodge Avenger was seen on surveillance footage fleeing an area adjacent to the primary scene. Pictures found on Ac-helles’ phone depict Defendant posing next to a blue Dodge Avenger. Defendant’s court documents were found in the blue Dodge Avenger when it was searched following Achelles’ arrest. Although the surviving witness did not identify Defendant as the perpetrator, witness testimony and the evidence regarding the cell phone towers, combined with the surveillance footage, placed Defendant in the immediate vicinity of the crime scene at the time of the murder.
The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08); 985 So.2d 234, 240. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, this is a matter of the weight of the evidence, not its sufficiency. State v. Miller, 11-498 (La.App. 5 Cir. 12/13/11); 84 So.3d 611, 617, writ denied, 12-176 (La.9/14/12); 97 So.3d 1012.
In reaching a verdict, the jury obviously believed the testimony of the State’s witnesses 6Ver the self-serving testimony of Defendant, his girlfriend, and her mother. Viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found that the State proved beyond a reasonable doubt the essential elements of the crime, *305 including Defendant’s identity as one.of the perpetrators of the offense. Based on the forgoing, we find that the trial court did not abuse its discretion when it denied Defendant’s motion for a new trial.

Admission of Lawrence Brookes’ Testimony

| aaIn this assignment of error, Defendant alleges that the trial court abused its discretion in permitting Lawrence Brookes to testify as an expert. He notes that the trial court apparently found Mr. Brookes’ 29 years of experience in automotive design and his ownership of two Dodge Avengers to be enough to be qualified as an expert in mechanical engineering and automotive design. However, Defendant argues that Mr. Brookes was unable to list the dimensional characteristics of the Dodge Avenger and could not cite an authority in arriving at his conclusions. ’ Further, Defendant contends that Mr. Brookes’ opinion was based on conjecture that could not.be tested by any scientific method. He argues that the trial court abused its discretion in permitting Mr. Brookes to offer his opinion as to the make of the car in the surveillance video. Because Mr. Brookes’ testimony placed Ac-helles’ car on the scene, along with his argument that the evidence in the -case was insufficient, Defendant contends that the trial court’s error in permitting this testimony was reversible error.
The State responds that at trial, Defendant stipulated that Mr. Brookes qualified as an expert in automotive design and mechanical engineering. The State contends that Defendant has failed to show how Mr. Brookes’ qualifications were inadequate. The State avers the trial -court did not abuse its discretion in finding Mr. Brookes’ expert opinion reliable concerning the identification of the car in the videotape.
During trial, Lawrence Brookes was called by the State as a witness. Mr. Brookes testified regarding his C.V., and" that he had a total of 29 years of experience working for Fiat Chrysler Automobiles in numerous capacities. His position at the time of trial was the head of product analysis. He explained that “product analysis is a group of engineers who áre assigned to the office of the general counsel at our company to assist in the technical explanation of vehicles, | ^historian, discovery work, define documents, and any other thing that our legal team would want in regards to mostly product litigation issues.” He also held certifications in accident reconstruction and vehicle fire and investigation. The State tendered him as an expert in mechanical engineering and automotive design. Defense counsel accepted Mr. Brookes, as an expert in that field. However, at the bench, outside the hearing of the jury, defense counsel objected to “any opinion testimony that he provides as to any videotape or identification of cars in videotapes” because it was “outside the scope of his expertise.” The trial court then conducted a Daubert[4] hearing outside the presence of the jury. During this hearing, the State presented the transcript of the testimony previously given by Mr. Brookes in the proceedings relating to the co-defendant, Achelles.
During the hearing, defense counsel questioned Mr. Brookes regarding his knowledge regarding the Dodge Avenger. Mr. Brookes testified that over the past three years, he had seen “thousands” of Dodge Avengers and noted that he used to own two Dodge Avengers for two years, *306 interacting with the car daily." He testified that he was familiar with the design of the Dodge Avenger but did not. necessarily know the design dimensions “off the top of [his] head.” Previously, in 2011, Mr. Brookes viewed video footage of a vehicle and identified it in connection with an accident reconstruction. On that occasion, Mr. Brookes was. able to determine the identity of the vehicle. When asked about his methodology in identifying the vehicle, he explained that
there’s a lot of people that are very familiar with car designs that could tell you from pictures and video, “That car is this.” That is what my basis of my testimony is based on. It’s a design that I may very well, in looking at a video, it’s like watching my kids. I know it’s one of my kids, I don’t know how to describe it any better.
124He further stated, “I know from my training and experience what I see is a-Dodge Avenger in the videotapes that were given to me. I could write down the features.” Additionally, he testified that he was “confident that somebody with [his] background and experience would be able to take that report [he] could write and apply it.”
At the conclusion of the traversal, defense counsel conceded that ■ “there’s no dóubt in anyone’s mind [that] Mr. Brookes is an" accomplished mechanical engineer,” However, defense counsel argued that the basis of Mr. Brookes’ opinion was his training and experience constituted “classic ipse dixit testimony.” Citing Kumho Tire,[5] Defendant averred that an expert “cannot tender an opinion simply because that expert says that it’s true.” At trial, defense counsel did not object to Mr. Brookes being qualified as an expert, but more to the point that Mr. Brookes’ testimony was outside the scope of his expertise, and that his testimony did not meet Daubert ⅛ standards.
In ruling, the trial court cited Carrier v. City of Amite, 08-1092 (La.App. 1 Cir. 2/13/09); 6 So.3d 893, writ denied, 09-0919 (La.6/5/09); 9 So.3d 874, a case the court found “compelling.” The trial court quoted:
When confusion arose over, whether the Daubert test applied to nonscientific expert testimony, the United -States Supreme Court stated that Daubert’s holding — setting forth the trial court’s general - gatekeeping - obligation — applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge. However, the court held that the test of reliability is flexible, and Daubert’s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. The factors identified in Daubert may or may not be pertinent in assessing reliability, ■ depending on the nature of the issue, the expert’s particular expertise,,-and the subject of his testimony. The law • grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.
12RThe factual basis for an expert’s opinion determines the reliability of the testimony. An unsupported opinion can offer no assistance to the fact finder, and 'should not be admitted as expert testimony. The trial court’s inquiry must be tied to the specific facts Of the particular case.
The trial court further cited Merlin v. Fuselier Construction Inc., 00-1862 (La. *307 App. 5 Cir. 5/30/01); 789 So.2d 710, stating:
We -note that in Daubert, the United States Supreme Court was concerned with determining the admissibility of new techniques as a basis for expert scientific testimony. In the case of Kumho, the court noted that a trial court may apply Daubert when deter-, mining the admissibility of all expert testimony. The court also recognized, however, that a trial court has broad discretion in determining whether Dau-bert’s specific factors are reasonable measures of reliability in a particular case. Ultimately, the trial court’s decision to admit or exclude expert testimony is subject to the abuse of discretion standard.
Tracking the language of Carrier, the trial court further noted the factual basis for Mr. Brookes’ expert testimony:
Mr. Brookes has 29 years of experience with Chrysler. , He has designed these vehicles from beginning to end and managed designers. He is clearly familiar with the designs of Chrysler vehicles, including the Dodge Avenger. He owns two of those Dodge Avengers.
He notes all the distinguishing factors, of the Dodge Avenger, including the lights, the positioning of the lights, and in particular, he noted the swoop in the back door and the plastic cutout, I believe is how the testimony read last ... he testified that the colors offered in that time frame, swooped up to the back prior to the back glass, and then, as you can see, there is a triangle blacked-out panel. Again, based on his experience, which he said other experts with his same experience could judge it, in this case, the court finds that the expert testimony of Mr. Brookes would be reliable.
On appeal, Defendant first argues that the trial court abused its discretion by allowing Mr. Brookes to testify as an expert. However, defense counsel did not object to Mr. Brookes being .qualified as an expert at trial. Defendant only challenged the reliability of the methodology used by the' expert. ■ Thus, Defendant did not preserve that issue for review on appeal. Defendant also argues that the trial court abused its discretion by permittiiig Mr. Brookes to offer his opinion as to-Ufithe make of the car in the surveillance video. He claims that Mr, Brookes’ testimony was based oh conjecture that could not be tested by any scientific method.
_ As a. general rnatter, under La C.E. art. 702, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in: .issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The trial judge is. vested with broad discretion in determining the scope of expert testimony. State v. Borden, 07-396, p. 23 (La.App. 5 Cir. 5/27/08); 986 So.2d 158, 172. Competence of an expert witness is. a question of fact to be determined within the sound discretion of the trial judge; her rulings on the qualifications of expert witnesses will not be disturbed in the absence of manifest error. State v. Higgins, 03-1980 (La.4/1/05); 898 So.2d 1219, 1239, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005) (quoting State v. Stucke, 419 So.2d 939, 944 (La.1982)) (citing State v. Drew, 360 So.2d 500 (La.1978)).
In State v. Addison, 05-378 (La.App. 5 Cir. 12/27/05); 920 So.2d 884, 895, 897, writ denied, 06-1087 (La.11/9/06); 941 So.2d 36, the defendant argued that the trial court committed reversible error by accepting an officer as an expert because he did not have scientific credentials to *308 prove his expertise, his assessments were based on total conjecture, and he did not employ any kind of scientific method in arriving at his conclusions. Although this Court concluded that the issue was not preserved on appeal, this Court found that the defendant failed to show how the officer’s qualifications were so lacking that he should not have been qualified as an expert in the area. This Court considered the officer’s training and experience and found that the trial court did not abuse its broad discretion in finding the officer was competent to testify as an expert.
|a7Here, Mr. Brookes was qualified as an expert in mechanical engineering and- automotive design. In his testimony, he determined from surveillance video that the vehicle depicted therein was a Dodge Avenger. In his previous testimony at Achelles’ trial, he listed very specific details about the car, including its taillight placement, as well as other distinctive features in making his conclusion. He testified that he was very familiar with the vehicle and had previously positively identified a vehicle from surveillance video. Considering Mr. Brookes’ education and experience, his explained methodology, and previous qualification in Achelles’ trial, we find that Defendant has failed to show how Mr. Brookes’ qualifications were so lacking that his testimony regarding the identity of the vehicle was unreliable. Thus, we find that the trial judge did not abuse his discretion in finding Mr. Brookes’ expert opinion reliable concerning the identification of a car in the surveillance video.

Excessive Sentence

In this assignment of error, Defendant argues that the trial court erred when it imposed consecutive life sentences for the two counts of second degree murder. While he concedes that consecutive sentences have no practical effect with a life sentence imposed, he contends that should not change the law and the necessity of justifying a deviation from the preferred imposition of concurrent sentences. He specifically argues that his sentences violate the Louisiana Constitution in that they are excessive. Additionally, Defendant points out that the trial court failed to justify why the sentences were made consecutive and why it deviated from the law’s preference for concurrent sentences codified in La.C.Cr.P. art. 883 for acts arising out of the same set of facts and circumstances. The crux of Defendant’s argument is that the trial court did not sufficiently articulate why the two sentences were consecutive rather than concurrent.
lasThe State responds that Defendant is precluded from raising the consecutive nature of his sentences on appeal. It contends that although Defendant orally objected to his sentences at the time of sentencing, he did not state specific grounds upon which his objection was made, make an oral motion for reconsideration of sentence, or file a written motion for reconsideration. Thus, the State concludes Defendant is limited to a bare review of the sentences for constitutional excessiveness. To that end, the State contends that Defendant has not shown that his mandatory life sentences are constitutionally excessive.
The trial court sentenced Defendant to life imprisonment without the benefit of probation, parole, or suspension of sentence on both counts to run consecutively. The record reveals that Defendant did not make an oral motion for reconsideration of sentence or file a written motion to for reconsideration of sentence on the grounds now raised on appeal. The record does reflect that defense counsel orally objected to Defendant’s sentences at the time of sentencing but did not raise the issue of the consecutive nature of the sentences.
*309 This Court has held that the failure to file a motion to reconsider sentence or to state the specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for unconstitutional excessiveness. State v. Ross, 13-924 (La.App. 5 Cir. 5/28/14); 142 So.3d 327, 333; State v. Hunter, 10-552 (La.App. 5 Cir. 1/11/11); 59 So.3d 1270, 1272. Further, this Court has held that when the consecutive nature of sentences is not specifically raised in the trial court, the issue is not included in the bare constitutional review, and the defendant is precluded fi’om raising the issue on appeal. State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11); 67 So.3d 535, 593. Accordingly, we will not address the imposition of consecutive sentences.
[ MSeconcl degree murder carries a mandatory life sentence. La. R.S. 14:30.1; Jacobs, supra. A mandatory minimum sentence is presumed to be constitutional. Id. Further, Louisiana courts have consistently held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. Id.
After considering the specific facts of this case under a bare constitutional review, we do not find that Defendant’s consecutive life sentences for the two counts of second degree murder are unconstitutionally excessive.

Error Patent Review

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La. App. 5th Cir.1990).
Although the commitment reflects that Defendant’s sentences were imposed at hard labor, the transcript does not reflect that the trial judge ordered the sentences be imposed at hard labor or provided that the sentences would be served with the Department of Corrections. Generally, where there is a, discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
La.C.Cr.P. art. 879 requires a court to impose a determinate sentence. If the applicable sentencing statute allows discretion, the failure to indicate whether the sentence is to be served at hard labor is an impermissible indeterminate sentence. State v. Norman, 05-794 (La.App. 5 Cir. 3/14/06); 926 So.2d 657, 661, writ denied, 06-1366 (La.1/12/07); 948 So.2d 145. Defendant was sentenced on both counts pursuant to La. R.S. 14:30.1, which mandates the sentences be served at hard labor. As such, we find that the trial court’s failure to state that the sentence was imposed at hard labor is harmless error and no corrective action is required. Is ¡See Id. See also State v. Dennis, 12-818 (La.App. 5 Cir. 5/16/13); 118 So.3d 1166, 1174, writ denied, 13-1384 (La.12/6/13); 129 So.3d 530.
Additionally, the record reflects that the trial court failed to notify Defendant of the two-year prescriptive period for filing an application for post-conviction relief, as required by La.C.Cr.P. art. 930.S.[6] By means this opinion, we correct the error and inform Defendant that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under. La. C.Cr.P. art. 914 or 922. State v. Brewery, *310 12-236 (La.App. 5 Cir. 1/30/13); 108 So.3d 1246; State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08); 2 So.3d 445, 451, writ denied, 09-158 (La.10/16/09); 19 So.3d 473.
DECREE
For the foregoing reasons, we affirm Defendant’s convictions and sentences.

AFFIRMED

. The transcript also reflects the spelling of Ms. Rollins' first name as "Nakita.”

-. Detective Gai explained that the Automatic License Plate Recognition System (ALPRS) *297 includes "several cameras set up in specific locations on the Eastbank and Westbank” that "snapshots the license plate and a picture of the vehicle of every vehicle that passes that intersection during the course of a day, and it stores them on a database.” ■

. When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary, Id. Alternatively, when the entirety of the evidence, .both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. Id. Therefore, the sufficiency of the evidence is addressed before defendant's other assignments. See also State v. Nguyen, 05-569 (La.App. 5 Cir. 2/3/06); 924 So.2d 258, 262.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct, 1167, 143 L.Ed.2d 238 (1999).

. Neither the sentencing transcript, the uniform commitment order, nor the sentencing minute entry reflect that Defendant was noti-fled of the two-year prescriptive period for filing an application for post-conviction relief.