CHAISSON, J.
|tOn appeal, defendant, Garard K. Ac-helles, challenges his convictions and sentences for second degree murder, possession of a firearm by a convicted felon, and pandering. For the reasons set forth herein, we affirm defendant’s convictions and sentences and remand the matter for correction of an error patent noted herein.
PROCEDURAL HISTORY
On April 17, 2014, a Jefferson Parish Grand Jury returned an indictment charging defendant with two counts of second degree murder, in violation of 14:30.1 (counts one and two); one count of possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1 (count three); and one count of pandering, in violation of La. R.S. 14:84 (count four).[1] At the arraignment on May 5, 2014, defendant pled not guilty.
Following the disposition of some pretrial motions, defendant proceeded to trial before a twelve-person jury on March 16, 2015. After considering the evidence presented, the jury, on March 19, 2015, found defendant guilty as charged on all counts. On March 26, 2015, the trial court heard and denied defendant’s motion for a new trial.
Thereafter, on April 6, 2015, the trial court sentenced defendant to life imprisonment at hard labor on counts one and two, twenty years imprisonment at hard labor on count three,[2] and five years imprison *1071 ment at hard labor on count four. The sentences on counts one, two, and three were imposed without benefit of parole, probation, or suspension of sentence. Defendant now appeals.
| .FACTS
This case stems from the killings of Demektric Anderson and Tacara Williams-Moss that occurred in Jefferson Parish in the early morning hours of December 30, 2013.
Ramonica Gainey, a friend of both victims, testified at trial regarding the events surrounding and leading up to the murders. According to Ms. Gainey, she traveled with Mr. Anderson and Ms. Williams-Moss from Memphis to New Orleans in December of 2013 in a black Dodge Charger belonging to Ms. Williams-Moss. The group checked into a Super 8 Hotel in Metairie, and while in town, Ms. Gainey planned to make money by “entertaining.” To accomplish that purpose, Ms. Gainey explained that she made postings to a website, Backpage.com, listing her picture and a contact phone number. Shortly after her post on December 30, 2013, at 4:21 a.m., Mr. Anderson received a phone call and then relayed to Ms. Gainey and Ms. Williams-Moss that he had to go deliver some Xanax pills.
Eventually, all three of them left the hotel in the black Dodge Charger to meet the potential buyer for the pills. Mr. Anderson drove, Ms. Williams-Moss was in the front passenger seat, and Ms. Gai-ney was in the rear passenger seat. They drove a short distance and arrived at an apartment complex. As they pulled into the apartment complex, Ms. Gainey saw a black man standing on the driver’s side. Mr. Anderson spoke with the man through the rolled-down driver’s side window about the price of the pills. Ms. Gainey then noticed another black man at the rear of the car and heard him say, “Is this the guy?” As Mr. Anderson was reaching to put the car in reverse, the two men “opened fire on the car.” Ms. Gainey related that after Mr. Anderson collapsed and the car crashed off the | ¡¡service road, she called 9-1-1. As a result of this gunfire, Mr. Anderson and Ms. Williams-Moss were fatally wounded.[3]
Sergeant Eddie Klein, Detective Thomas Gai, and other members of the Jefferson Parish Sheriffs Office arrived and began their investigation at both the primary scene where the shooting occurred at 2508 Pasadena Avenue and the secondary scene where the incident ended by the entrance ramp near Clearview by the south service road. At trial, Sergeant Eddie Klein testified about the collection of evidence at these two scenes. At the primary scene, the officers recovered a total of sixteen casings from both .45 and 9 mm caliber guns. At the secondary scene, they recovered projectiles from inside of the vehicle, four cell phones, including the one belonging to and surrendered by Ms. Gainey, and two clear bags containing marijuana and pills, later determined to be Xanax.
In addition to collecting evidence, the officers obtained surveillance videos from cameras located in the area surrounding both crime scenes. The videos showed a blue vehicle parking on the corner of Guiff- *1072 rías and L Streets and two individuals exiting the vehicle and walking in the direction of the location on Pasadena Avenue where the shootings occurred. Subsequent video shows one suspect running in the direction of the parked vehicle and a second suspect trailing behind. At trial, Lawrence Brookes, an expert in mechanical engineering and automotive design, testified that the blue car depicted in the video surveillance was a Dodge Avenger.
In addition to collecting evidence and obtaining surveillance videos, Detective Gai spoke with Ms. Gainey, the surviving witness, during the initial investigation. As a result, Detective Gai learned about the drug transaction [ ^between the victims and suspects and further discovered that arrangements for the purchase were made via Mr. Anderson’s cell phone.
Detective Gai thereafter obtained search warrants for the cell phones recovered and turned them over to the digital forensic unit for analysis. Of the three phones analyzed, Detective Solomon Burke with the Jefferson Parish Sheriffs Office Digital Forensics Unit was only able to extract data from Mr. Anderson’s phone. His analysis revealed that during the time frame leading up to the shootings, Mr. Anderson’s phone had five interactions with the suspect phone number 504-214-9686 — two incoming calls and three outgoing calls. In particular, Mr. Anderson received two calls from the 214 number on December 30, 2013, the day of the murders — one at 3:01 a.m. and one at 4:58 a.m. The three outgoing calls were also on December 30, 2013 — at 5:02 a.m., 5:10 a.m., and 5:13 a.m. After the 5:13 a.m. call, there was no more outgoing activity on Mr. Anderson’s phone.
Given that these calls occurred in close proximity to the shootings, Detective Gai attempted to track this suspect phone, which was determined to be associated with a prepaid customer. When the cell phone provider was unable to provide a location for this phone, Detective Klein did a Google search of the number that revealed the number was listed on several ads on Backpage.com, a website that facilitates prostitution. Based on the names in these ads, “Magic” and “Honey,” the officers searched and discovered other phone numbers connected to these two women.
Detective Gai then contacted Sergeant Locascio of the vice squad, and he arranged a meeting with these two females at the La Quinta Hotel on Veterans Boulevard. The two women, who arrived in a blue Dodge Avenger driven by defendant, proceeded to the hotel room that had been rented out by Sergeant Locascio. After a transaction was made between him and the women, Detective RGai proceeded to the room, and the two individuals, identified as Abby Stallworth and Calvenia Dott, were arrested.
Both Ms. Stallworth and Ms. Dott testified at trial regarding their association with defendant and the circumstances surrounding their stay in the New Orleans area. Their testimony indicated that they came to New Orleans twice in December of 2013 to try to make money through prostitution and that they used the website Backpage.com to facilitate their work. On their first trip, they met defendant, who introduced himself as “Hurk,” and Jason Thomas, referred to as “Jay,” at the Super 8 Hotel in Metairie. The parties exchanged phone numbers during this first encounter, and at some point, both Ms. Stallworth and Ms. Dott returned to Mississippi. However, after Christmas, they called Mr. Thomas expressing their desire to return, and defendant, Mr. Thomas, and Glenn Lem- *1073 mon[4] came to Mississippi in a blue Dodge and brought them back to New Orleans. On this second trip, they stayed at the same Super 8 Hotel in Metairie and again posted on Backpage.com, using a phone that was not their own; it was a flip phone that they had gotten from Mr. Thomas with the phone number 504-214-9686.
While they were staying at the Super 8, defendant and Mr. Thomas “met a guy at the store in a black Charger,” who was selling pills, in particular, Xanax. When the two women expressed an interest in getting some pills, a phone call was made to the seller with the flip phone used in the Backpage.com ad. The two men left and came back with the pills. After their return, Mr. Thomas commented that he wanted to rob the person in the black Charger because he saw some pills and money in the car. The two men left again, and on this occasion, defendant and Mr. Thomas each took a gun with them, as well as the flip phone used to post on the Backpage.com ad.
| (¡Defendant and Mr. Thomas did not return to the Super 8 Hotel, and pursuant to instructions by Mr. Lemmon, Ms. Stall-worth and Ms. Dott relocated to another hotel, the London Lounge. While in the hotel room with defendant, Mr. Thomas, and Mr. Lemmon, news came on the television about the murders of individuals in a black Charger. Ms. Dott described that “they weren’t acting the same” because they were “just all quiet and stuff.” Then the women overheard Mr. Thomas comment that he “got that boy.” Ms. Stall-worth also heard defendant say that he shot too. In addition, Mr. Thomas complained about injuring his foot and defendant told him to “get rid of them shoes.” There was further conversation that the flip phone had been thrown in the river.[5] Since this phone that they were using for their Backpage.com ad was no longer available, Ms. Stallworth and Ms. Dott had to use their own phones for business.
Subsequently, they received a call from a client, asking them to meet at the La-Quinta Inn, After Ms. Dott informed defendant of the call, defendant drove them to the hotel to engage in prostitution. Once in the hotel room, Ms. Stallworth and Ms. Dott were arrested pursuant to the sting operation and brought to the criminal investigations bureau for questioning. As a result of the interviews, the officers were lead to suspects in the shootings — Garard Achelles a/k/a “Hurk,” Jason Thomas a/k/a “Jay,” and Glenn Lemmon a/k/a “Ace.”
In addition, Sergeant Klein stopped defendant on the scene of the sting operation in a blue Dodge Avenger. After defendant was arrested, he gave a statement, in which he claimed to be at McDonald’s with Mr. Lemmon and Mr. Lemmon’s girlfriend, Daintia Brock, during the time surrounding the shootings. | ^However, through the course of the investigation, it was proven that defendant was not at the McDonald’s.[6] In his statement, defendant *1074 also admitted being in possession of a firearm.
DENIAL OF BATSON CHALLENGES
In this assignment of error, defendant argues that the trial court erred in denying his Batson challenges because the State exercised its peremptory challenges in a discriminatory manner to exclude five prospective jurors: Samekey Lomax, Ty-neisha Chevalier, Tyreon Edmond, Charlotte Taylor, and Alicia Rice-Jackson. Defendant contends that the State’s race-neutral reasons for excusing these African-American jurors were not sufficient and maintains that he met his burden of proving discriminatory intent.
The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. In Batson v. Kentucky, 476 U.S. 79, 94-98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of prospective jurors were based on race. First, the defendant challenging the peremptory strike must establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the State to articulate a neutral explanation for the challenge. Third, the trial court then must determine if the defendant has carried the ultimate burden of proving purposeful discrimination.
The Batson decision is codified in La. C.Cr.P. Art. 795(C), which provides that no peremptory challenge made by the State or the defendant shall be based solely upon the race of the juror. State v. Massey, 11-357 (La.App. 5 Cir. /27/12), 91 So.3d 453, 467, writ denied, 12-991 (La. 9/21/12), 98 So.3d 332. Article 795(C) further provides that if an objection is made that the State or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race-neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror.
Applying this analysis to the instant case, we find that the trial court did not abuse its discretion in denying defendant’s Batson challenges. The first step of our inquiry, whether defendant made a prima facie showing of purposeful discrimination, is rendered moot since the State offered race-neutral explanations. See Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).
The second step of the analysis, whether the State articulated a race-neutral reason for the challenge, does not demand an explanation that is persuasive or even plausible. The race-neutral explanation must be one that is clear, reasonably specific, legitimate, and related to the case at bar. At the second step of the Batson inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race-neutral. Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam); State v. Massey, 91 So.3d at 468.
In the present case, after the State exercised a peremptory challenge on a fifth African-American female juror, de *1075 fendant raised a Batson challenge. Without a request from the trial court, the State provided reasons for the challenges. In particular, the State noted that Ms. Rice-Jackson and Ms. Taylor rated the police a “5” on a scale of 1 tolO. In addition, the State articulated that they were both individuals who responded very quickly on the question of wanting DNA. 19With regard to Ms. Lomax, the State articulated that she “said she was not sure if she could convict on a life sentence” and “indicated she had class.” The State provided that Ms. Chevalier “also said she was not sure if she could convict based on a life sentence,” and that Ms. Edmond “said the same statement about not being able to convict based on a life sentence.” The trial court found all these explanations to be race-neutral. We find no reason to disturb those determinations by the trial court. Accordingly, we proceed to the third step of the Batson analysis, which focuses on whether the defendant has proven purposeful discrimination.
In determining whether a defendant has met his burden of showing purposeful racial discrimination in the State’s exercise of peremptory challenges, the proper question is whether the proof offered by the defendant, when weighed against the State’s proffered race-neutral reasons, is strong enough to convince the trier of fact that the claimed discriminatory intent is present. State v. Wilson, 09-170 (La.App. 5 Cir. 11/10/09), 28 So.3d 394, 405, writ denied, 09-2699 (La. 6/4/10), 38 So.3d 299. A trial judge’s findings on a claim of purposeful discrimination are entitled to great deference by the reviewing court because they depend largely on credibility evaluations. State v. Florant, 12-736 (La.App. 5 Cir. 5/23/13), 119 So.3d 635, 642, writ denied, 13-1451 (La. 1/10/14), 130 So.3d 319. Credibility can be measured by factors including the prosecutor’s demean- or, how reasonable or how improbable the explanations are, and whether the proffered reason has some basis in accepted trial strategy. Because the trial judge has the advantage of observing the characteristics and demeanor of the attorneys and prospective jurors, the trial court occupies the best position for deciding whether a discriminatory objective underlies the peremptory challenges. State v. Massey, 91 So.3d at 469.
Based on our review of the record, and in particular, the voir dire transcript, we find that defendant failed to meet his burden of proving purposeful | ^discrimination. We note that when defendant made his Batson objection, he merely commented, “That’s five black females gone.” No additional facts beyond the raw number of strikes were provided by defendant. We also note that our review of this issue is made difficult because other than the five African-American jurors named in this assignment, the record does not reflect the racial makeup of other members of the venire panels or of the jury that was ultimately impaneled. Therefore, we find that the trial court did not abuse its discretion in denying defendant’s Batson challenges.[7]
*1076 EXPERT TESTIMONY
In his first pro se assignment of error, defendant argues that the trial court abused its discretion in qualifying Mr. Brookes as an expert in mechanical engineering and automotive design without inquiring into the relevance and reliability of the testimony as required by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
In the present case, the State noticed its intent to call Lawrence Brookes as “an expert in the Dodge Automobile Product Design.” The State further asserted that this expert, in his testimony, would identify the make of a car seen in video surveillance. On the first day of trial, prior to the beginning of witness testimony, the court conducted a Daubert hearing regarding the expert testimony of Lawrence Brookes.
At the hearing, Mr. Brookes testified regarding his educational background and extensive work experience in the automotive industry. Mr. Brookes had a total L Tof almost twenty-nine years of experience working for Fiat Chrysler Automobiles in numerous capacities. His position, at the time of trial, was the head of product analysis and regulatory processes. He also held certifications in accident reconstruction and vehicle fire and investigation. He testified that with his many years of experience with the company, he was very familiar with any car design that “we’ve manufactured in North America for the past 30, 40 years.” He testified that he was asked to review video footage and still photographs to identify the make of the vehicle depicted therein. Mr. Brookes concluded that the vehicle depicted was “for sure” a Dodge Avenger, most likely a model-year 2012 or later. In making this determination, he pointed out specific features of the vehicle depicted which indicated to him that it was a Dodge Avenger. For example, the headlamps were “square and flat to the front of the vehicle,” the tail lights “line[d] up like a Dodge Avenger,” and the unique “bright blue” color was consistent with colors offered in model-years 2012 to 2014.
Most importantly, Mr. Brookes described that the vehicle depicted had the Dodge Avenger’s back door, which was “very unique” and was “like no other car on the market.” He stated that the combination of all these elements together with his many years of experience enabled him to “deduce from that one video” that the vehicle was “a Dodge Avenger and no other car.” Also for thoroughness, even though he was “a hundred percent sure,” he compared the vehicle depicted to exemplars of other popular mid-sized cars, including a Chevy Malibu, a Chevy Cruze, a Honda Accord, and a Nissan Altima, but based on their features, he again concluded it was a Dodge Avenger. Moreover, Mr. Brookes related that he owned two Dodge Avengers and “look[ed] at them every day in [his] driveway.”
After considering the testimony of Mr. Brookes and the arguments of counsel, the trial found that Mr. Brookes was “certainly an expert in mechanical engineering and auto design” and allowed him to testify at trial in accordance with |12the testimony offered at the hearing. Defendant now argues that the trial court abused its discretion in qualifying Mr. Brookes as an expert in mechanical engineering and auto design when the court failed to apply Daubert’s “gatekeeping obligation,” requiring an inquiry into both relevance and reliability. He contends that Mr. Brookes’ opinion was not based on scientific testing, principles, or methodology and that it was unreliable and had no probative value because it did not assist the jury in determining a fact at issue. As a result, he concludes that *1077 his conviction and sentence should be reversed and remanded for a new trial. We find no merit to these arguments.
La C.E. Art. 702 governs the admissibility of expert testimony and provides that a witness, who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if the expert’s scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.
In State v. Boudoin, 11-967 (La.App. 5 Cir. 12/27/12), 106 So.3d 1213, 1225, writ denied, 13-255 (La. 8/30/13), 120 So.3d 260, this Court discussed the standards for the admissibility of expert testimony as follows:
In State v. Foret, 628 So.2d 1116 (La. 1993), the Louisiana Supreme Court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. State v. Chauvin, 02-1188 (La. 5/20/03), 846 So.2d 697, 700-701. To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the Supreme Court suggested the following general observations are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community. Daubert, 509 U.S. at 592-594, 113 S.Ct. 2786. Daubert’s general “ga-tekeeping” applies not only to testimony based upon scientific | ^knowledge, but also to testimony based on “technical” and “other specialized knowledge.” Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 142, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999); and Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181 (La. 2/29/00), 755 So.2d.226.
The trial court may consider one or more of the four Daubert factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case. Kumho Tire Co., Ltd., 526 U.S. at 142, 119 S.Ct. 1167. Rather, the law grants a district court “the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.” Id.
The trial judge is vested with broad discretion in determining the scope of expert testimony. State v. Borden, 07-396 (La.App. 5 Cir. 5/27/08), 986 So.2d 158, 172. Competence of an expert witness is a question of fact to be determined within the sound discretion of the trial judge whose rulings on the qualifications of expert witnesses will not be disturbed in the absence of manifest error. State v. Mosley, 08-1318 (La.App. 5 Cir. 5/12/09), 13 So.3d 705, 714, writ denied, 09-1316 (La. 3/5/10), 28 So.3d 1002.
In this pro se assigned error challenging Mr. Brookes’ expert testimony, defendant argues that the trial court failed to apply Daubert’s “gatekeeping obligation” which requires an inquiry into both relevance and reliability. This argument is clearly without merit as evidenced by the trial court’s very thorough reasons for judgment. In his reasons for judgment, the trial judge discussed Daubert and the confusion associated with its application in *1078 certain cases and further mentioned other cases relating to admissibility of expert testimony. The trial judge specifically cited Cheairs v. State ex rel. Department of Transportation and Development, 03-680 (La. 12/3/03), 861 So.2d 536, and focused on the factors set forth therein in his reasons for allowing the expert testimony.
First, the trial court considered whether the expert was qualified to testify competently about the matters he intended to address. In finding that Mr. Brookes |uwas “certainly an expert in mechanical engineering and auto design,” the trial court stated:
He, based upon his curriculum vitae that he went over at length, he has a master’s in mechanical engineering. He has gone over the designs of automobiles from Chrysler for years and years and years and has been employed with them for nearly thirty years. He’s even dealt with the clay design of the vehicles, the crash testing of the vehicles, the under-body design of these vehicles, the body-in-white and exterior engineering of these vehicles. He is certainly an expert in mechanical engineering and auto design.
Second, the trial court considered whether the methodology by which the expert reached his conclusion was sufficiently reliable as determined by the sort of inquiry mandated in Daubert. The trial court addressed defendant’s concern that “there is absolutely no methodology to be applied in this case, and the Daubert factor should be applied.” The court first commented that the Daubert factors are not necessary or even applicable in all cases and then continued as follows:
I’m not adopting the — the eyeball test, but essentially, the testing, if you will call it that, of Mr. Brookes as looking at the photographs is not a quote unquote testing where the Daubert factors would be useful....
The Court disagrees that Mr. Brookes is simply guessing. Mr. Brookes went on and went through all of these photographs and the video. I’ll say Video 1 he showed the headlamps, noted that it was mid-sized, noted that the rear lamps — he had an explanation for the headlamps and rear lamps were consistent with the 2012 or later Dodge Avenger.
The still 22, he suggested there was a very unique back. The door had a whale swoop and a blacked-out triangle, and that no other vehicle has all of these elements consistent on the same vehicle. And furthermore, there was a blue vehicle, which is a color consistent and offered by Chrysler from 2012 and 2014. The totality of all those design features and the totality of his experience, certainly this Court finds would be helpful and reliable.
Third, the trial court considered whether the testimony would assist the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or to determine a fact in issue. In addressing this factor, |1t;ttie trial court found that the testimony Mr. Brookes intended to offer “would assist the trier of fact and that his specialized expertise in dealing with the design of Chrysler vehicles, including the Dodge Avenger, would certainly be helpful to the jury, and that it would determine a fact at issue in this case of whether or not the Defendant was driving or was in the blue Dodge vehicle or some other vehicle.”[8]
*1079 Given these extensive reasons addressing both the reliability and the relevancy of the challenged expert testimony, we find no abuse of discretion in the trial court’s ruling that allowed the admission of Mr. Brookes’ expert testimony at trial. Accordingly, the arguments raised by defendant in this assigned error are without merit.
SEVERANCE OF OFFENSES
In his second pro se assignment of error, defendant challenges the trial court’s denial of his motion to sever the offenses.
In the present case, the indictment charged defendant with two counts of second degree murder, one count of illegal possession of a firearm by a convicted felon, and one count of pandering. Prior to trial, defendant filed a motion to sever the offenses pursuant to La. C.Cr.P. Art. 495.1, and at the subsequent hearing on the motion, defendant specifically requested that the pandering charge be separated from the other offenses because it “has absolutely nothing to do” with the other offenses. Defendant argued that he would be prejudiced if the pandering charge was tried with the other offenses because the jury would be confused and would infer guilt based on defendant’s involvement in the pandering.
After considering the arguments of counsel, the trial court denied defendant’s motion, noting that severing the charges “would prohibit the State from telling the entirety of the investigation” and “juries are smart enough to | ^separate the charges.” The court further noted that it would “instruct [the jury] to consider all these charges separately and distinctly” and would provide “sufficient instructions to insure that.. .if there is any prejudice, that it is very slight.”
Defendant now contends that the trial court abused its discretion in denying his motion for severance of the offenses. He specifically contends that trying him on four offenses at the same time resulted in “prejudicial confusion” because the jury had trouble segregating the evidence as to each count. In addition, defendant alleges that the possession of a firearm by a convicted felon charge was extremely prejudicial because it informed the jury that he had been previously convicted of an armed robbery. Further, he argues that the join-der of the offenses allowed the jury to infer a criminal disposition and made the jury hostile to his defenses. We find no merit to these arguments.
La. C.Cr.P. Art. 493 permits the joinder of offenses if the offenses charged “are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan” and the offenses are triable by the same mode of trial.
A defendant properly charged in the same indictment with two or more offenses pursuant to La. C.Cr.P. Art. 493 may nonetheless move for a severance of the offenses under La. C.Cr.P. Art. 495.1, which provides as follows:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
In determining whether prejudice results from a joinder of offenses, the trial court must consider the following factors: whether the jury would be confused by the various counts, whether the jury would be able to segregate the various charges and evidence, whether the defendant would be confounded in presenting his various de *1080 fenses, whether the crimes charged would be used by the jury to infer a 117criminal disposition, and whether, considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Fontenberry, 09-127 (La.App. 5 Cir. 10/27/09), 27 So,3d 904, 909-10, writ denied, 09-2665 (La. 5/28/10), 36 So.3d 246. In addition, it must be considered that prejudice from the joinder of offenses can be mitigated by clear jury instructions and by an orderly presentation of evidence by the State. State v. Davis, 12-512 (La.App. 5 Cir. 4/24/13), 115 So.3d 68, 84, writ denied, 13-1205 (La. 11/22/13), 126 So.3d 479.
A defendant alleging a prejudicial joinder of offenses has a heavy burden of proof. Motions to sever under La. C.Cr.P. Art. 495.1 are within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent an abuse of discretion. Factual, rather than conclusory, allegations are required when the defendant alleges prejudicial joinder of offenses on a motion to sever. State v. Fontenberry, 27 So.3d at 910. Finally, there is no prejudicial effect from joinder of offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. State v. Butler, 15-89 (La.App. 5 Cir. 7/29/15), 171 So.3d 1283, 1288, writ denied, 15-1608 (La. 10/10/16), 207 So.3d 408, 2016 WL 6238013.
Applying these principles to the present case, we find that defendant did not meet his heavy burden of proving prejudicial joinder. At trial, evidence of each crime was presented in a logical and orderly fashion. In addition, there is no indication that the jury was confused by the various counts, - or that defendant was confounded in presenting his defense. Moreover, the trial court charged the jury separately as to each' offense, explaining in detail what the State was required to prove with respect to each count. Accordingly, we find that these offenses did not |1Rwarrant a severance, and the trial court did not abuse its discretion in denying defendant’s motion to sever. This assigned error is without merit.[9]
ERRORS PATENT REVIEW
We have reviewed the record for errors patent, according to La. C.Cr.P. Art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La. App. 5th Cir. 1990). We first note that the transcript indicates that the trial court failed to advise defendant of the two-year prescriptive period for filing an application for post-conviction relief as required by La. C,Cr.P, Art. 930.8. By means of this opinion, we correct this error and inform defendant that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La, C.Cr.P. Arts. 914 or 922. See State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, 615, writ denied, 12-2478 (La. 4/19/13), 111 So.3d 1030.
Second, we note that the uniform commitment order incorrectly reflects that all four offenses were committed on December 30, 2013. While this is the correct offense date for the two counts of second degree murder, the record indicates that the offense date for the possession of a firearm by a convicted felon charge was on or between December 1, 2013, and Decem *1081 ber 30, 2013, and that the offense date for the pandering charge was January 1, 2014. In order to ensure an accurate record, we remand this case for correction of the uniform commitment order to reflect the correct offense dates. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142. Therefore, we direct the trial court to make the appropriate entries reflecting these changes and direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected uniform 113commitment order to the officer in charge of the institution to which defendant has been sentenced and to the Department of Corrections’ Legal Department. La. C.Cr.P. Art. 892(B)(2); State ex rel. Roland v. State, 06-244 (La. 9/16/06), 937 So.2d 846.
DECREE
Accordingly, for the reasons set forth herein, we affirm defendant’s convictions and sentences and remand the matter for correction of an error patent as noted herein.
AFFIRMED AND REMANDED

. The indictment also charged co-defendant, Jason L. Thomas, with two counts of second degree murder. The matter proceeded to trial before a twelve-person jury that found Thomas guilty as charged. On May 12, 2016, this Court affirmed his convictions and sentences. See State v. Thomas, 15-759 (La.App. 5 Cir. 5/12/16), 192 So.3d 291.

. The trial court also ordered defendant to pay a fine of $ 1,000.00 on count three.

. At trial, Dr. Marianna Eserman, a deputy coroner with Jefferson Parish, testified that she performed the autopsies on both victims. According to Dr. Eserman, Mr. Anderson sustained five gunshot wounds, and the cause of death was multiple gunshot wounds to the chest. Ms. Williams-Moss sustained four gunshot wounds, and the cause of death was from a gunshot wound that struck vital organs in her chest. Dr. Eserman testified that the location of these wounds was consistent with one or more shooters being positioned on the driver’s side of the vehicle and with the victims being seated in the vehicle.

. Glenn Lemmon is referred to as "Ace” throughout the transcript,

. At trial, testimony indicated that the last two calls made by the suspect phone utilized towers near the Mississippi River. In addition, the Automatic License Plate Recognition System placed the Dodge Avenger near the Mississippi River at the time of the last call.

. At trial, Daintia Brock testified that on December 30, 2013, she spent time with defendant, Jason Thomas, and Glenn Lemmon at the Super 8 Hotel. At some point, she, Mr. Lemmon, and defendant’s girlfriend, Sheran-da, went to the McDonald's at 2916 Jefferson Highway. However, she testified that neither Mr. Thomas nor defendant went to McDonald’s with them. The State introduced the receipts from McDonald’s dated December 30, 2013, which indicated times at 5:27 and 5:31 a.m. The State also introduced a still photograph taken from the surveillance at *1074 McDonald’s that morning. Ms. Brock identified herself, Mr. Lemmon, and Sheranda in the photograph.

. For the first time, defendant asserts on appeal that jurors Rice-Jackson and Taylor were struck on account of their race because another prospective juror, Lynn Adams, was retained on the petit jury despite offering an answer similar to Jackson and Taylor’s answer regarding their rating of the police. Also, for the first time on appeal, defendant argues that jurors Lomax, Edmond, and Chevalier were struck because of their race because another prospective juror, David Miner, was retained on the petit jury despite offering an answer similar to Lomax, Edmond, and Chevalier regarding their answer about mandatory life sentences. These assertions were not presented to the trial court, and therefore, defendant cannot now present them for the first time on appeal. See La. C.Cr.P. Art. 841; see also State v. Florant, 119 So.3d at 645.

. Detective Gai, in his testimony, indicated that a witness, who had seen the suspect vehicle that was fleeing on the night of the murders, had informed the police that the vehicle was a Nissan Altima.

. It is noted that defendant recently filed a pro se reply brief to the State’s opposition to his pro se supplemental appellate brief. Although defendant filed this reply brief after the case was submitted to this Court, we nonetheless considered the arguments presented therein prior to rendering this opinion.